## MINNESOTA FOREST PRODUCTS, INC., a Minnesota corporation, Plaintiff,

v.

## LIGNA MACHINERY, INC., a North Carolina company; H.E. "Butch" Wilson, individually; and Jocar, a/k/a Jose De Oliveira Carlos & Irmao, a Portuguese company, Defendants.

### No. CIV.A. 96–296/RHK/RLE.

United States District Court, D. Minnesota, Third Division.

April 22, 1998.

896

Susan Barnes & John Strothman, Lindquist & Vennum, Minneapolis, MN, for Plaintiff.

Eric Jorstad, Robert Collins & Karen Wilson, Faegre & Benson, Minneapolis, MN, for Defendants Ligna Machinery and H.E. "Butch" Wilson.

Alan Silver & Richard Pins, Doherty, Rumble & Butler, Minneapolis, MN, for Defendant Jocar.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiff Minnesota Forest Products, Inc. ("Forest") contracted with Defendant Ligna

Machinery, Inc. ("Ligna") for sawmill equipment and design services. Defendant Jocar ("Jocar"), a Portugese manufacturer of sawmill equipment, produced some of the equipment which Ligna sold to Forest. Ligna installed the equipment, but Forest was not satisfied with the equipment's performance. Forest filed the instant action, alleging claims for breach of contract against Ligna, breach of implied and express warranties against all Defendants, fraud against all Defendants, negligence against all Defendants, and negligent design against Ligna and its president, Defendant H.E. Butch Wilson Jr. ("Wilson"). Presently before the Court are Defendants Ligna and Wilson's Motion for Partial Summary Judgment and Defendant Jocar's Motion for Summary Judgment. For the reasons set forth below, the Court will grant Ligna and Wilson's Motion in part and grant Jocar's Motion in its entirety.

### Facts

### I. The Parties

Forest is a Minnesota corporation located in Onamia, Minnesota. It operates a sawmill and sells lumber products. (Dec. 17, 1996 L. Doose Aff. ("1st L. Doose Aff.") ¶¶ 1–2.) Larry Doose, the president of Forest, and his wife, Yvonne Doose, are the sole owners of Forest. (Mar. 9, 1998 L. Doose Aff. ("2nd L. Doose Aff.") ¶ 3 .)

In 1983, the Dooses began working in the sawmill industry for Ratzlaff Logging & Lumber ("Ratzlaff"), a company that Yvonne's father owned. (L. Doose Dep. 19; 2nd L. Doose Aff. ¶ 4.) Ratzlaff had operated a circle saw type sawmill[1] in Onamia, but it shut down in the early 1980's, (L. Doose Dep. 19–20.) Larry Doose made this mill operational again (hereinafter "Mill C") and then managed it. (Id. at 19–21.) During the period that he managed Mill C, Larry Doose oversaw the purchasing, installation and repair of equipment in the mill, including the installation of a new debarker, carriage drive system, and chip screening system. (Id. at 21–23, 25.) He understood how the machines worked and had a "real strong understanding of electrical and hydraulics." (Id. at 25–26.)

In June 1986, the Dooses bought Mill C from Ratzlaff, and in late 1986 they formed Forest. (L. Doose Dep. 26–27.) Mill C produced NHLA grade lumber, wood chips, and some low grade lumber. (Id. at 28.) Between 1986 and 1997, Forest made several substantive changes to the machine centers at Mill C. (Id. at 29–36.) It replaced the debarker, carriage, log turner, sawyer's cab, edger, and gang saw; it added a computerized setworks to the carriage, redid the waste system, installed a vibrating conveyor system and a jumpskid transfer, and moved the chipper. (Id.)

Ligna is a North Carolina corporation with its principal place of business in Burlington, North Carolina. (Compl. ¶ 3.) It designs sawmills and manufactures equipment used in the timber industry. (Id.) Wilson is the president of Ligna. (Id. ¶ 4.)

Jocar is a Portuguese company that manufactures sawmill equipment. Since 1987, Ligna has been the sole United States distributor and representative of Jocar's sawmill equipment. (Themudo Dep. 17–18; June 2, 1997 Y. Doose Aff. ¶ 2.) Jocar sells sawmill equipment to Ligna, which in turn sells it to third parties. (Themudo Dep. 19–20.) Jocar does not know for how much Ligna resells its equipment. (Id.) Jocar and Ligna have never entered into joint projects together. (Wilson Dep. 195.) Jocar, however, referred to Ligna as its "agent" in a letter that it sent to Forest. (See id. Ex. D (Jocar's Nov. 9, 1995 fax to Yvonne Doose).)

When Ligna buys equipment from Jocar, Jocar usually is paid in three phases. (Themudo Dep. 23.) Typically, Jocar receives either 20% or 30% as a pre-payment with the order from Ligna, 60% or 70% when it delivers the equipment to the United States, and the remaining 10% or 20% when Ligna is paid. (Id.)

Jocar gave Ligna permission to use its name in advertising that Ligna distributes in the United States. (Wilson Dep. 195–96.) Jocar does not ask to see such advertising before it is distributed. (Id.) Jocar also gave Ligna advertising prepared by Jocar for dis-

---

1. A "circle saw" is a saw with a single large circular blade. (2nd L. Doose Aff. ¶ 3.)

tribution in the United States. (Themudo Dep. 30–36.)

## II. The Contracts

Sometime in either 1992 or 1993, Forest began considering an expansion of its sawmill business. (2nd L. Doose Aff. ¶ 3; Y. Doose Dep. 98.) Forest wanted a new mill ("Mill B") that could process smaller diameter logs for use as high-end, pallet lumber. (2nd L. Doose Aff. ¶ 5.) Forest had no experience in milling pallet lumber, and it had no experience with twin bandsaws, thin kerf sawing, and sharp chain systems that could be used to mill such lumber. (2nd L. Doose Aff. ¶ 15; L. Doose Dep. 91.)

In early 1993, Forest contacted two companies, Fastline and Tipton, about equipment for its new mill. (L. Doose Dep. 65–67.) Larry Doose visited two of Tipton's mills in Missouri and a "Tipton installation in Wisconsin" to see how Tipton's equipment operated (*Id.* at 81.) In the summer of 1993, Tipton sent Forest a written quotation and a blueprint design for Ligna's proposed new mill. (*Id.* at 81–82.)

In 1993, Forest bought an edger for Mill C from Ligna. (L. Doose Dep. 46–47.) After this purchase, Jim Besonen ("Besonen"), a sawmill equipment sales representative from whom Forest had bought machinery in the past, recommended that Forest consider buying equipment for its new mill from Ligna.[2] (*Id.* at 67–68; 2nd L. Doose Aff. ¶ 6.) Besonen arranged for the Dooses and a Ligna representative, Joe Caron, to visit mills in Michigan and Wisconsin that used Ligna equipment. (L. Doose Dep. 68–69.) In late 1993, Besonen and the Dooses traveled to North Carolina to see other mills that were using equipment representative of the type of equipment that would be used in Forest's new mill, and they also toured Ligna's plant. (2nd L. Doose Aff. ¶ 7; L. Doose Dep. 79.) The owners of these mills told Larry Doose that they were happy with the equipment that Ligna had sold them. (L. Doose Dep. 71–78.) In 1994, the Dooses again visited North Carolina again, and toured several facilities that used Ligna equipment with Wilson. (*Id.* at 86–96.)

### A. Ligna's Representations to Forest

Larry Doose told Wilson that his primary purpose for considering a new sawmill was to be able to process pallet lumber out of material that Forest was chipping for its customers. (Wilson Dep. 400; 2nd L. Doose Aff. ¶ 8.) Wilson told him that Ligna could supply Forest with a mill design and appropriate and reliable equipment to manufacture such pallet lumber. (2nd L. Doose Aff. ¶ 8.)

Forest claims that Wilson made the following representations to it during the course of their discussions about Forest's desired sawmill design and equipment, and that these representations induced Forest into entering into design and equipment contracts with Ligna: (1) "that the mill design and that the Ligna and Jocar equipment quoted will consistently produce at least 40,000 board feet per shift in pallet lumber and considerably more in grade lumber" (2nd L. Doose Aff. ¶ 17(A));[3] (2) "that the Jocar and Ligna equipment being purchased by [Forest] was tested, reliable, and ideal for Forest's proposed use" (2nd L. Doose Aff. ¶ 17(B)); (3) "that Ligna's customers have been totally satisfied with Ligna's sawmill design and products and [Forest] will be also" (*Id.*

---

2. While the Court is unclear of the exact nature of the relationship between Besonen and Ligna, the record indicates that Besonen was some sort of distributor of Ligna equipment. (*See* Besonen Dep. 23–24.)

3. Ligna points out that Forest, in its Complaint, alleged that Ligna represented that its sawmill design and equipment could attain Forest's production goal of 40,000 board feet, but that Forest did not specify the type of lumber involved. (Ligna Reply Mem. at 5–6.) In its Complaint, Forest alleged that Wilson represented that "Ligna had adequately studied the sawmill production and piece count needs of [Forest] and had

concluded that [Forest'] requirements, including 40,000 bf, could be achieved with Ligna's design and Ligna's equipment ordered by [Forest]." (Compl.¶ 41(a)). While it is true that Forest did not specifically allege that Wilson told it that Ligna's sawmill design and equipment could produce 40,000 board feet of *pallet lumber*, it is clear from the record that Forest's sawmill production needs for Mill C were to produce pallet lumber. Thus, the Court believes that Forest did adequately plead that Ligna told it that its design and equipment would produce 40,000 board feet of pallet lumber.

¶ 17(C)); (4) "that Ligna has a well trained and talented staff of engineers designing sawmills and sawmill equipment" (*Id.* ¶ 17(D)); (5) "that Rich Landers ('Landers') was Ligna's chief engineer and that he would design [Forest's] project and see it through complete engineering, manufacture, installation and start up" (*Id.* ¶ 17(E)); (6) "that Landers is one of the best sawmill designers in the country with extensive experience in designing complete sawmills of the nature [Forest] is considering" (*Id.* ¶ 17(F)); (7) "that the equipment which Ligna manufactures and which Ligna sells as agent for Jocar is unconditionally guaranteed" (*Id.* ¶ 17(G)); (8) "that [Wilson] guarantee[d] that Ligna will stand 100% behind its design and equipment we sell you" (*Id.* ¶ 17(H)); (9) "that Ligna will deliver on time and in a sequence that will permit the orderly installation of equipment" (*Id.* ¶ 17(I)); (10) "that the mill will perform to [Forests's] specifications within 30 to 60 days of start-up and the only delay in reaching full production will be from Forest's operators to become used to the equipment which should take a couple of weeks." (*Id.* ¶ 17(J)).

Forest also claims that Ligna and Jocar made many statements in its advertising about the experience and abilities of their equipment, including the following representations: (1) "Jocar band headsaw and resaws ... quality manufacturing ... extremely tough ... economically priced;" (2) "Jocar— very strong, fast and efficient;" (3) "Jocar— easy to work due to its simplicity;" (4) "Jocar—very robust and efficient machine and well-constructed;"(5) "Jocar—if you don't like it, you don't keep it;" (6) "Jocar—innovative and technologically advanced to reduce maintenance and repair costs;" (7) "band mills produce approximately 10% more lumber from any given log diameter in comparison to circle head saw;" (8) "extremely profitable to switch to a Bank Headrig." (2nd L. Doose Aff. ¶ 18 & Ex. 1 (Defendants' advertising).) [4]

**B. The Design Contract**

In the spring of 1994, Ligna agreed to provide design and engineering services for Mill B for $12,500. (2nd L. Doose Aff. ¶ 12.) Ligna agreed to prepare all blueprints, working drawings, and designs necessary to fully lay out and construct Mill B so that it would meet Forest's specifications regarding production. (*Id.*) At this time, Forest was not obligated to buy, nor had it agreed to buy, any sawmill equipment from Ligna. (*Id.*) In August 1994, Forest paid Ligna in full for its design services. (*Id.*)

Jocar was not involved in the design of Mill B. (Themudo Dep. 100; Besonen Dep. 165.) Jocar did not see the blueprints for Mill B until after it had received an order for equipment from Ligna, but it did see a document entitled "Sawmill Project Designed for Minnesota Forest Products, Onamia, Minnesota, Revision 2" before it received an order from Ligna. (Themudo Dep. 55; 145–46.)

In late December 1994, Wilson told Larry Doose that Landers had left Ligna. (2nd L. Doose Aff. ¶ 21.) Forest claims that at this time, Wilson stated that Landers had finished all of Forest's designs before he left, and that Wilson would personally oversee Forest's project until it was fully satisfied with it. (*Id.*) At the time Landers left, however, he had not begun the designs on the equipment that Forest had purchased. (Landers Dep. 132; Wilson Dep. 159–60.)

**C. The Equipment Contract**

In April 1994, Ligna began sending Forest quotations about sawmill equipment for Mill B. The Court will not repeat the discussion in its February 24, 1997 Memorandum Opinion and Order about the various Ligna quotations and Forest purchase orders that the parties exchanged. While Ligna and Forest dispute the exact terms of the equipment

---

**4.** In his Second Affidavit, Larry Doose states that Ligna and Jocar made representations to Forest in their advertising and promotional materials, and he attaches to this Affidavit a "representative sample" of the Defendants' advertising and a 2–page list, including 44 representations made in this advertising. (2nd L. Doose Aff. ¶ 18 & Ex. 1.) In its Complaint, Forest included only some of these representations from the advertising as part of its Fraud claim. Because a party must plead fraud with specificity, which includes identification of the fraudulent statement that the defendant made, the Court will consider only those misrepresentations from the advertising which were pled in Forest's Complaint.

contract into which they entered, they agree that the equipment contract was entered into in October 1994, either in the form of a Ligna Quotation, dated October 28, 1994, or a Forest Purchase Order, dated October 25, 1994.

All of the Quotations that Ligna sent Forest contained "Conditions of Sale" on the back side of the Quotation. Paragraph 17 of the "Conditions of Sale" read:

> Warranty: Seller warrants that all equipment and parts described hereunder and sold to the Purchaser will be free from defects in material and workmanship under normal use and under proper maintenance. This warranty is extended from the date of delivery for the respective product categories as defined below.
>
> | Product Category | Warranty Period |
> | --- | --- |
> | New machinery and parts | 60 days |
> | Rebuilt machinery and parts | 30 days |
> | Parts Specified "As is" condition | NO WARRANTY |
>
> All machinery components such as motors, contacts, bearings, etc. are warranted as long as the original manufacturer's warranty, if any, is in force. Seller's liability to the Purchaser to repair and replace such products or parts proven to be defective as to materials or workmanship is the sole and exclusive remedy of the Purchaser. . . .
>
> THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OR MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, PERFORMANCE OR OTHERWISE.

(Jorstad Aff. Ex. J (Ligna Conditions of Sale).)

Ligna's Quotation No. 4806, which was dated October 28, 1994, contained the following provision:

> LIGNA MACHINERY, INC. agrees to modify item # 17 under "Conditions of Sale" as listed on reverse side of page one of our quotation # 4806. We will extend the warranty period from 60 days to six months on our workmanship only. All oth-

er terms and conditions as listed in item 17 still apply.

(Jorstad Aff. Ex. I at 7 (Quotation # 4806).)

Although he testified in prior affidavits submitted to the Court that Forest did not accept any of the terms contained in Ligna's Quotations, Larry Doose testified during his deposition as follows:

> Q. I'm asking what you thought the warranties were that covered the problems.
> A. The warranties were that the equipment was supposed to work and the system that we bought was supposed to work. That's simple.
> Q. Were there any written warranties to which you were referring—
> A. I understand there was a six-month warranty on this.
> Q. What is your understanding based upon?
> A. Documentation that I've seen.
>
> . . .
>
> Could you also pull out Ligna's quotations?
> Q. Sure. Do you want to see the terms because they're separate.
> A. No, I don't want to see the terms. I want to see the front of them.
>
> . . .
>
> Yeah. *On Mr. Wilson's quote No. 4806, on the front on his quotation, which we did accept the front side of his quotation, it says, "we will extend the warranty period from 60–day to six-month."*
>
> . . .
>
> That was a condition that my wife had negotiated with Butch about, wanted the warranty extended from 60 days to six months, and he agreed to it, obviously.
> Q. So, you're referring to the sentence which says, "We will extend the warranty period from 60 days to six months on our workmanship only," correct?
> A. That's what I'm referring to.
> Q. And is it your testimony that you accepted the front of Quotation 4806, the front pages of quotation 4806?
> A. Well, Yvonne put together our purchase order from different purchase orders that Ligna Machinery had—different quo-

tations they had sent out. This is one of the terms that we all understood.

. . .

Q. So you accepted his six-month warranty as listed in 4806?

A. Yes.

(L. Doose Dep. 282:15–285:18 (emphasis added).)

Jocar did not see any of the quotations that Ligna sent Forest in 1994 or the October 25, 1994 Purchase Order that Forest sent Ligna. (Themudo Dep. 20–21.) Ligna, however, had sent several faxes to Jocar during June and July 1994, informing it of a potential customer of a Jocar twin band headsaw, sharp chain, and singulator, and asking questions about the performance of such equipment, especially in the winter. (Barns Aff. Exs. N–R (faxes between Ligna and Jocar regarding equipment).) None of these faxes mentioned the name of the potential customer. (*Id.*)

On December 22, 1994, Ligna sent four purchase orders to Jocar, each requesting that Jocar provide Ligna with a specific piece of equipment—a log singulator, a twin-band scrag, a single-band horizontal resaw, and a green chain—that met certain specifications. (Silver Aff. Ex. 45 (Ligna faxes to Jocar).) Jocar charged Ligna $170,000 for this equipment, and Ligna still owes Jocar $35,000 for it. (*Id.;* Themudo Dep. 48.) Ligna then resold this equipment to Forest for $363,000. (Silver Aff. Ex. 5 (Ligna Quotations).) Jocar did not know how much Ligna charged Forest for the equipment that it had bought from Jocar and resold to Forest. (Themudo Dep. 48.)

## Analysis

### I. Standard of Review

Federal Rule of Civil Procedure 56 states:

[Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the court should draw all justifiable inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the adverse party's response must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514. *See also* Fed.R.Civ.P. 56(e).

### II. Fraud

#### A. The Economic Loss Doctrine

Forest alleges that all of the Defendants committed fraud by making false representations to Forest about their equipment and skills as designers and manufacturers of sawmill equipment. (Compl.¶¶ 40–46.) All of the Defendants argue that the economic loss doctrine bars this claim.

Minnesota law limits recovery for economic loss that arises from the sale of goods in a commercial setting. Minnesota first recognized the economic loss doctrine in *Superwood Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159, 160 (Minn.1981), in which the plaintiff sued the defendant for negligence and strict products liability for a defective press that it had sold the plaintiff. The *Superwood* Court held that "economic losses that arise out of commercial transactions,

except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." *Id.* at 162. As a rationale for its decision, the court noted that:

> The U.C.C. clarifies the rights and remedies of parties to commercial transactions.... The recognition of tort actions in the instant case would create a theory of redress not envisioned by the legislature when it enacted the U.C.C. Furthermore, tort theories of recovery would be totally unrestrained by legislative liability limitations, warranty disclaimers, and notice provisions. To allow tort liability in commercial transactions would totally emasculate these provisions of the U.C.C. Clearly, the legislature did not intend for tort law to circumvent the statutory scheme of the U.C.C.

*Id.*

The Minnesota Supreme Court clarified the economic loss doctrine in *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990), and in doing so, overruled the portion of *Superwood* which held that the economic loss doctrine did not bar tort claims arising out of commercial transactions involving damage to other property. *Id.* at 687–88. The *Hapka* Court held that "the U.C.C. must control exclusively with respect to damages in a commercial transaction which involves property damage only." *Id.* at 688. The Court explained that:

> while there is reason to sacrifice consistency in order to preserve tort remedies for personal injuries arising out of commercial transactions, as well as those arising out of consumer transactions, there is no similar reason in cases of property damage arising out of commercial transactions to heap tort theories of negligence and strict products liability atop those remedies already provided by the U.C.C. Accordingly, in our judgment the Uniform Commercial Code must control exclusively with respect to damages in a commercial transaction which involves property damage only, and any statement or implication to the contrary in *Superwood* and its progeny is hereby expressly overruled. If the Code is

to have any efficacy, parties engaged in commercial activity must be able to depend with certainty on the exclusivity of the remedies provided by the Code in the event of a breach of their negotiated agreement.

*Id.*

In 1991, the Minnesota Legislature codified a portion of the economic loss doctrine in Minnesota Statutes § 604.10. *See AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1087 n. 3 (8th Cir.1998) (noting that "the economic loss doctrine is now part statutory" and that "we see no indication that the statute was intended to replace or narrow the scope of the broader common law doctrine"). If a claim arises out of the sale of goods, the doctrine is based upon Minn.Stat. § 604.10, but if it involves "a different type of Article 2 contract," then the common law controls. *See id.* (noting that for purposes of the economic loss doctrine, distributor agreement was an Article 2 contract, even though it was not a contract for the sale of goods, and thus, it was governed by the common law, economic loss doctrine, and not Minn.Stat. § 604.10); *but see Regents of the Univ. of Minn. v. Chief Indus.*, 106 F.3d 1409, 1411 (8th Cir. 1997) (noting that it is proper to interpret Minn.Stat. § 604.10 in harmony with the principles of Minnesota's common law regarding the economic loss doctrine).

Minnesota Statutes § 604.10 provides:

(a) Economic loss that arises from a sale of goods that is due to damage to tangible property other than the goods sold may be recovered in tort as well as in contract, *but economic loss that arises from a sale of goods between parties who are each merchants in goods of the kind is not recoverable in tort;*

(b) Economic loss that arises from a sale of goods, *between merchants, that is not due to damage to tangible property other than the goods sold may not be recovered in tort;*

(c) The economic loss recoverable in tort under this section does not include economic loss due to damage to the goods themselves;

(d) The economic loss recoverable in tort under this section does not include economic loss incurred by a manufacturer of goods arising from damage to the manufactured goods and caused by a component of the goods.

### 1. *Nature of the Contracts Between Forest and Ligna*

■ Forest argues that the economic loss doctrine does not bar its fraud claim because there are two contracts at issue—a contract for the design of the sawmill and a contract for the sale of the sawmill equipment. (Pl.'s Mem. in Opp'n to Defs. Wilson and Ligna's Mot. for Summ. J. at 20.) ("Pl.'s Mem. in Opp'n to Ligna") The U.C.C. only governs contracts for the sale of goods, *see* Minn.Stat. § 336.2–102 (1998), and similarly, Minn.Stat. § 604.10 applies only to the sale of goods. *Id.* § 604.10. Forest contends that its contract with Ligna for sawmill design services is not a contract for the sale of goods, and therefore, the economic loss doctrine does not bar the portion of its fraud claim that relates to this contract. (Pl.'s Mem. in Opp'n to Ligna at 20.) Ligna responds that under the "predominant purposes" test, it had only one contract with Forest, a contract for the sale of goods. (Defs.' Wilson and Ligna's Reply Mem. at 3) ("Ligna's Reply Mem.")

■ Minnesota courts have adopted the "predominant purposes" test to "determine *whether a contract* that involves both goods and services falls within Article 2 of the Uniform Commercial Code as adopted in Minnesota." *City of Willmar v. Short–Elliott–Hendrickson,* 475 N.W.2d 73, 79 n. 3 (Minn.1991) (emphasis added); *see also Vesta State Bank v. Independent State Bank,* 518 N.W.2d 850, 854 (Minn.1994) (noting that Minnesota courts use the "predominant purposes" test to determine when Article 2 of the U.C.C. applies to "hybrid transactions that involve both the sale of goods and the provision of services"). Under this test, a "hybrid transaction is classified according to its dominant characteristic." *Vesta State Bank,* 518 N.W.2d at 854.

The Court finds that two separate and distinct contracts are involved in the instant case, one for the design of Forest's sawmill and the other for the sale of sawmill equipment. Forest contracted with Ligna for the sawmill design in early 1994, and in mid-August 1994, Forest paid Ligna in full for these services. (L. Doose Aff. ¶ 12.) At this time, Forest had not agreed, and was not obligated, to buy any sawmill equipment from Ligna. In October of 1994, Ligna agreed to sell Forest nearly $800,000 worth of sawmill equipment. Ligna has not provided the Court with any evidence that these transactions were somehow part of one, larger contract between the parties. It merely alleges, without factual support, that Forest "purchased design services along with its purchase of the sawmill equipment from Ligna." (Ligna's Reply Mem. at 3.) The factual record before the Court, however, indicates that the parties entered into two separate and independent contracts.

Moreover, the cases upon which Ligna relies for its contention that the Court should use the "predominate purposes" test to determine the nature of the contract between Ligna and Forest are distinguishable from the instant case. Each involves a factual situation where the parties entered into one contract that included both the sale of goods and services. *See Vesta State Bank,* 518 N.W.2d at 854 (sale of a combine along with the lessor's interest in the accompanying lease); *Willmar,* 475 N.W.2d at 79 (contract for "all materials necessary to complete" the water treatment parts designed by a third party); *AKA Distrib. Co. v. Whirlpool Corp.,* 948 F.Supp. 903, 906 (D.Minn.1996) (distributorship agreement for sale of vacuum cleaners and their subsequent repair), *aff'd, AKA Distrib.,* 137 F.3d 1083, 1084. None of these cases involved separate, independent contracts that the parties entered into months apart, and therefore, the Court finds these cases inapposite.

While the equipment contract was for the sale of goods, the design contract between Forest and Ligna did not involve goods, but was a contract for services. The Court finds that neither the U.C.C. nor Minn.Stat. § 604.10 govern the design contract. *See Western Lake Superior Sanitary Dist. v. Orfei & Sons, Inc.,* 463 N.W.2d 781, 787 (Minn.Ct.App.1990) (holding that the U.C.C.

does not apply to a contract for services). The economic loss doctrine does not bar the portion of Forest's fraud claim that relates to representations that Wilson and Ligna made with respect to the design contract. *See* Minn.Stat. § 604.10 (indicating that it applies to "contracts for the sale of goods"); *Hapka,* 458 N.W.2d at 687–88 (holding that economic loss doctrine bars tort claims for commercial transactions that are governed by the U.C.C.) The Court, therefore, will deny the Defendants' Motion with respect to their claims that the economic loss doctrine bars the portion of Forest's fraud claim that involves the design contract.[5]

The Court notes, however, that Jocar did not directly make any of the misrepresentations that Forest has alleged induced it to enter into the design contract, and that none of Ligna's or Wilson's representations involved any services that Jocar would be providing to Forest. The record indicates that Jocar did not participate in the design of Mill B. Thus, in order for Jocar to be responsible for Ligna and Wilson's statements, Forest must establish that Ligna was Jocar's agent with regard to sawmill design. Because the Court finds that Ligna was not Jocar's agent, *see* Section C *infra,* the Court will grant Jocar's Motion with respect to the portion of Forest's fraud claim that involves misrepresentations that fraudulently induced Forest to enter into the design contract.

### 2. *Forest's Status*

■ Under Minnesota law, the U.C.C. provides the exclusive remedy for property damage arising out of a commercial transaction for the sale of goods "only when that sale fits *Hapka*'s narrow definition of a 'commercial transaction,' i.e., where the parties to the sale are dealers in the same goods, or to use a more precise term, 'merchants in goods of the kind.'" *Lloyd F. Smith Co., Inc. v. Den–Tal–Ez, Inc.,* 491 N.W.2d 11, 14 (Minn. 1992); *see also* Minn.Stat. § 604.10(a)-(c) (stating that economic loss arising from sale of goods *between merchants* is not recoverable in tort).

■ Minnesota law defines a merchant as:

> a person who deals in goods of the kind *or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction* or to whom such knowledge or skill may be attributed by his employment of an agent or a broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Minn.Stat. § 336.2–104(1) (1998) (emphasis added). Thus, a person is a merchant either because she deals in the type of goods sold or because she has specialized knowledge about the goods sold. *Regents of University of Minnesota v. Chief Indus.,* 106 F.3d 1409,- 1411 (8th Cir.1997) (holding that Minn.Stat. § 604.10 governed plaintiff's tort claims because the university was a merchant in its purchase of a grain dryer because it had knowledge or skill peculiar to grain dryers). However, "not all large, sophisticated purchasers are necessarily merchants in goods of the kind they buy, just as an informed and careful individual consumer does not become a 'merchant.'" *Id.* at 1412. The issue of whether a party is a merchant is a question of fact for the jury to decide. *Prenger v. Baker,* 542 N.W.2d 805, 808 (Iowa 1995).

■ In the instant case, Forest may be considered a merchant only if it possessed *specialized knowledge or skill peculiar to the sawmill equipment that it bought from Ligna.* *See Chief Indus.,* 106 F.3d at 1412; Minn.Stat. § 336.2–104(1). The Court believes that genuine issues of material fact exist regarding this issue. It is true that the Dooses had 15 years of experience in the sawmill business, and that they worked with circle saw, sawmill equipment on a daily basis. In addition, they had purchased and installed sawmill equipment in Mill C, both when Yvonne's father owned it and when they owned it. However, the record also

---

5. Ligna also contends that the economic loss doctrine bars Forest's claim for negligent design of the sawmill (Count V). The Court finds that the economic loss doctrine does not bar this claim for the same reason that it does not bar Forest's fraud claim that relates to the design contract: it involves neither a contract for the sale of goods nor another Article 2 contract governed by the economic loss doctrine.

indicates that the Dooses had not milled low-grade pallet lumber before they bought the equipment for Mill B from Ligna. In addition, they had neither used nor had any knowledge about the type of equipment that Ligna sold them for Mill B, specifically twin bandsaws and thin kerf saws. Forest has presented evidence that the equipment they purchased from Ligna was substantially different and much more complex than what they used in Mill C. Based upon this evidence, a reasonable jury could conclude that Forest did not possess specialized skill or knowledge about the types of sawmill equipment that it bought from Ligna.[6]

The Court does not believe that the Eighth Circuit's opinion in *Chief Industries* dictates a different result. In that case, the court found that the university had specialized knowledge about a grain dryer that it had purchased because it had purchased six grain dryers over the course of 30 years, it had a centralized purchasing department that solicited bids for the project, and it consulted an

expert in grain dryers before making its purchase. *Chief Indus.*, 106 F.3d at 1412. In the instant case, Forest had not purchased the type of equipment it bought from Ligna, did not have a centralized purchasing department, and did not consult an expert before buying the equipment from Ligna. Moreover, the *Chief Industries* court emphasized that based upon *the undisputed facts of that case*, the district court properly determined that the university was a merchant, indicating that the issue of whether a party is a merchant is a highly fact-specific and individualized determination. *Id.*

■ If Forest is not a merchant with respect to its purchase of sawmill equipment from Ligna, then the economic loss doctrine would not bar the portion of its fraud claim that relates to the equipment contract.[7] *See Lloyd F. Smith Co.*, 491 N.W.2d at 14; *see also* Minn.Stat. § 604.10(a) (stating that "economic loss that arises from a sale of goods that is due to damage to tangible property

6. Ligna contends that *Nelson Distributing v. Stewart–Warner Industrial*, 808 F.Supp. 684 (D.Minn.1992), is squarely on point with the instant case. (Ligna's Reply Mem. at 2–3.) In *Nelson*, the plaintiff, a manufacturing company of snow blowers and crop shredders, sued the defendant, a manufacturer of industrial balancers that the plaintiff used to manufacture its own products, for, *inter alia*, fraudulent misrepresentation. *Id.* at 685. The court found that the economic loss doctrine barred plaintiff's misrepresentation claim because the case involved a commercial transaction where the plaintiff sought to recover only property damage. *Id.* at 687–88. Despite Ligna's contention to the contrary, the Court in *Nelson* did not determine, or even address, whether the plaintiff was a merchant, as defined by the U.C.C.

7. The Court believes that if the jury concludes that Forest is a merchant with respect to the sale of sawmill equipment for Mill B, then Minn.Stat. § 604.10 bars its fraud claim that relates to the equipment contract.

Minnesota's economic loss doctrine is part statutory. While the doctrine began as a common law doctrine, *see e.g., Hapka*, 458 N.W.2d at 688, it was partially codified in Minn.Stat. § 604.10. Section 604.10 states that it applies to economic loss that arises from the *sale of goods*. Minn.Stat. § 604.10(a). In *AKA Distributing Co. v. Whirlpool Corp.*, 137 F.3d 1083 (8th Cir.1998), the Eighth Circuit applied the economic loss doctrine to a contract that did not involve the sale of goods, but an agreement about the future sale of goods. *Id.* at 1084. The Court noted that

this contract was not for the sale of goods, but was a "different type of Article 2 contract." *Id.* at 1087 n. 3. It concluded that "we see no indication that the statute was intended to replace or narrow the scope of the broader common law doctrine." *Id.* The *AKA* opinion made no other reference to Minn.Stat. § 604.10.

In *Chief Industries*, the Eighth Circuit noted that "the Minnesota Supreme Court has considered no economic loss cases since section 604.10 was enacted.... We ... agree with the district court that it is proper to construe section 604.10 in harmony *with the principles set forth*" in cases interpreting the common law economic loss doctrine. 106 F.3d at 1411. The *Chief Industries* Court held that "the district court properly concluded that, as a matter of law, the University was a merchant of goods of the kind and that section 604.10 bars any action in tort." *Id.* at 1412.

The Court finds that *Chief Industries*, and not *AKA*, is dispositive of Forest's fraud claim. *AKA* does not impact this Court's analysis of Forest's fraud claims because it dealt with the common law economic loss doctrine, and did not interpret Minn.Stat. § 604.10. Section 604.10(a) clearly states that "economic loss that arises from a sale of goods between parties who are each merchants in goods of the kind *is not recoverable in tort*." (emphasis added). Based upon the plain language of Section 604.10, Forest's claims for fraud would be barred if Forest is a merchant. *See Chief Indus.*, 106 F.3d at 1412 (holding that when parties are merchants, Section 604.10 "bars any action in tort").

other than the goods sold may be recovered in tort as well as in contract," but economic loss that arises from a sale of goods *between merchants* is not recoverable in tort). The Court, therefore, will deny the Defendants' Motion with respect to their contention that the economic loss doctrine bars the portion of Forest's fraud claim that relates to the equipment contract.[8]

■ While the economic loss doctrine will not bar Forest's fraud claim that relates to the equipment contract if it is not a merchant, Minn.Stat. § 604.10 limits the damages that Forest can recover for this claim. Minnesota Statutes § 604.10 provides that "economic loss that arises from a sale of goods that is due to *damage to tangible property other than the goods sold* may be recovered in tort as well as in contract" but that "the economic loss recoverable in tort under this section *does not include economic loss due to damage to the goods themselves.*" *Id.* § 604.10(a) & (c) (emphasis added). Under Minnesota law:

> "[e]conomic loss" has been defined as resulting from the failure of the product to perform to the level expected by the buyer and commonly has been measured by *the cost of repairing or replacing the product and the consequent loss of profits,* or by the diminution in value of the product because it does not work for the general purposes for which it was manufactured and sold.

*Minneapolis Soc'y of Fine Arts v. Parker–Klein Assocs. Architects, Inc.,* 354 N.W.2d 816, 820–21 (Minn.1984), *overruled on other grounds, Hapka,* 458 N.W.2d at 688(emphasis added); *see also Lloyd F. Smith Co.,* 491 N.W.2d at 15 (noting that a party cannot

recover economic loss due to damage to the defective product itself and that "this economic loss includes consequential damages for repair and loss of profits resulting from inability to use the defective product during the period of its replacement or repair"). Thus, under the clear language of the statute, Forest cannot recover in tort for economic loss due to damage to the sawmill equipment itself.[9]

In the materials it submitted to the Court, Forest listed the following damages: (1) the cost of the Ligna and Jocar equipment ($808,000); (2) the cost of additional equipment for Mill B ($946,000); (3) the cost to build and furnish the building that housed the equipment ($285,000); (4) the cost of the design contract ($12,500); (5) losses suffered due to delay in deliveries of the equipment ($75,000); (6) additional labor and repair costs during the period in which Forest operated Mill B and tried to cure its defects, and additional workers not specified as necessary under the mill design ($1,423,000); (7) additional interest on Forest's debt due to negative cash flow related to Mill B ($248,000); and (8) foreclosure on other tangible assets of Forest and destruction of its viable business ($1,500,000).

The Court concludes that many of these damages are economic losses due to damage to the sawmill equipment itself because they are either repair and replacement costs for the defective equipment and consequent lost profits, or the diminution in value of the equipment due to its failure to work for the general purposes for which it was sold. *Parker–Klein,* 354 N.W.2d at 820–21. Such economic loss includes: (1) the cost of the saw-

---

8. Ligna argues that Forest's fraud claim should be barred because the representations alleged are the same as the contract terms that it alleges were breached. (Ligna's Supp. Mem. at 13–16.) After reviewing this section of Ligna's Memorandum, including the cases upon which it relies, the Court concludes that this argument is merely a restatement of Ligna's argument regarding the economic loss doctrine, which the Court has already addressed.

9. Forest contends that Minn.Stat. § 604.10 "does not apply where the plaintiff seeks damage to non-tangible property," such as damage to business, lost profits, and extra labor and repair

costs. (Pl.'s Mem. in Opp'n to Jocar's Mot. for Summ. J. at 20.) ("Pl.'s Mem. in Opp'n to Jocar") The Court finds that the statute does not support Forest's contention. Section 604.10 clearly indicates when a plaintiff may recover economic loss—which includes the type of damages that Forest has listed, such as loss of profits and repair and replacement costs—in tort. The key to when a plaintiff can recover such economic loss is based upon the cause of the economic loss: damage to the goods that the plaintiff bought or damage to other tangible property. *See Lloyd F. Smith,* 491 N.W.2d at 15; *Parker–Klein,* 354 N.W.2d at 821; Minn.Stat. § 604.10.

mill equipment; (2) the cost of additional equipment; and (3) additional labor and repair costs. The Court will leave open the issue of whether some of Forest's other alleged damages, such as additional finance charges and the subsequent foreclosure on its other assets due to "cash flow" problems related to Mill B, are really a different name for Forest's loss of profits due to damage to the equipment itself, and thus also barred by Minn.Stat. § 604.10.

The Court concludes that, while the Defendants are not entitled to summary judgment on their contention that the economic loss doctrine bars the portion of Forest's fraud claim that relates to the equipment contract, the economic loss doctrine will preclude Forest from recovering economic loss due to damage to the sawmill equipment itself.[10]

### 3. Components of a Larger Unit

■ Jocar contends that even if Forest is not a merchant, its tort claims are still barred because Forest is only claiming damages for the loss of property which is part of a larger unit into which the sawmill equipment was incorporated—the mill itself. (Jocar's Mem. in Supp. of its Mot. for Summ. J. at 13–14.) ("Jocar's Supp. Mem.")

Minnesota Stat. § 604.10(d) provides that "the economic loss recoverable in tort under this section does not include economic loss incurred by a manufacturer of goods arising from damage to the manufactured goods and caused by a component of the goods." *See also Transport Corp. of Am., Inc. v. IBM*, 30 F.3d 953, 957 (8th Cir.1994) (holding that plaintiff who bought disk drive from the defendant could not recover economic loss due to damage to the computer system, the larger unit into which the disk drive was incorporated, because it was not "other property"); *Parker—Klein*, 354 N.W.2d at 820–21 (holding that plaintiff who bought bricks from the defendant could not recover economic loss due to damage to the walls into which the

bricks were incorporated because the building did not constitute "other property").

The Court rejects Jocar's contentions that the sawmill equipment is a component of the larger unit of the mill itself and that Forest cannot recover economic loss due to damage to that larger unit. The record indicates that the machines the Defendants sold Forest were separate machine centers, each capable of operating on its own and cutting wood independently. The Court finds that independent pieces of machinery are factually distinguishable from bricks that are incorporated into a wall, or a disk drive that is incorporated into a computer system, and therefore, the cases upon which Jocar relies are inapposite. *See Transport Corp.*, 30 F.3d at 957; *Parker–Klein*, 354 N.W.2d at 820–21. Accordingly, the Court will deny the Defendants' Motion with respect to their contention that Minn.Stat. § 604.10(d) bars the portion of Forest's fraud claim that relates to the equipment contract.

### B. Elements of Fraud

■ In order to establish its fraud claim, Forest must show that: (1) there was representation by a party: (2) the representation had to do with a past or existing fact; (3) the representation was false; (4) that fact must be material; (5) it must be susceptible of knowledge; (6) the representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it was true or false; (7) the representer must have intended to have the other person induced to act, or justified in acting upon it; (8) that person must have been so induced to act or so justified in acting; (9) that person's action must be in reliance upon the representation; (10) that person must suffer damage; (11) that damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury. ·*Davis v. Re–Trac Mfg. Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967); *Lampert Lumber Co. v. Ram*

---

**10.** The Defendants argue that the economic loss doctrine bars Forest's claim for negligence because Forest alleges that they negligently designed and manufactured the sawmill equipment. If the jury determines that Forest is a merchant, the economic loss doctrine will bar this claim.

Genuine issues of material fact exist with respect to this issue, and therefore, the Court will deny the Defendants' Motions with respect to their contention that the economic loss doctrine bars Forest's negligence claim (Count IV).

*Constr.,* 413 N.W.2d 878, 881 (Minn.Ct.App. 1987).

### 1. *Representations About a Past or Present Fact*

The Defendants contend that Forest's fraud claim is not actionable because the misrepresentations that it alleges Ligna and Wilson made were vague statements of opinion, promises to act in the future, or predictions about how the sawmill equipment would perform, and therefore, they are not statements about past or present facts. (Ligna's Supp. Mem. at 11–12; Jocar's Supp. Mem. at 16.)

■■■ Under Minnesota law:

> a representation of expectation as to future acts or events is not a sufficient ground for the charge of fraud merely because the represented act or event did not take place. Such representations are not treated as assertions of existing facts and amount to nothing more than conjectures of future events. To amount to actionable fraud, a representation must be material as to a past or existing fact, and not to a future event.

*Cady v. Bush,* 283 Minn. 105, 109, 166 N.W.2d 358, 361 (1969) (holding that statement that motel would have a certain number of students staying in it was not actionable misrepresentation about a past or existing fact); *see also Schoenhals v. Mains,* 504 N.W.2d 233, 236 (Minn.Ct.App. 1993) (holding that statement that if plaintiffs signed a guarantee and the church defaulted, then the proceeds from the sale of the church would be split with the plaintiffs was not fraudulent because it was a statement of future events); *Kramer v. Bruns,* 396 N.W.2d 627, 631 (Minn.Ct.App.1986) (holding that statements that defendant intended to accept a government storage offer and split future profits with the plaintiffs was not actionable because it was statement of future events). In addition, fraudulent statements must be more than statements of opinion or puffing. *Hollerman v. F.H. Peavey & Co.,* 269 Minn. 221, 228–29, 130 N.W.2d 534, 540 (1964); *see also Midwest Printing, Inc. v. AM Int'l, Inc.,* 108 F.3d 168, 170–71 (8th Cir.1997)

(holding, under provision of Missouri fraud law which is identical to Minnesota's, that defendant's representations that its printer would dramatically increase capacity, perform in a manner superior to other presses of its size, reduce set-up time, and set new standard for reliability and ease of maintenance were non-actionable statements of opinion or puffing); *American Computer Trust Leasing v. Jack Farrell Implement Co.,* 763 F.Supp. 1473, 1486–87 (D.Minn. 1991) (holding that defendant's representations that no other system compares to its product, that it was a proven dealer in data processing, and that its product was capable of dramatically increasing the efficiency and profitability within plaintiff's dealership were non-actionable statements of opinion and puffing), *aff'd* 967 F.2d 1208 (1992); *Dollar Travel Agency, Inc. v. Northwest Airlines, Inc.,* 354 N.W.2d 880, 883 (Minn.Ct.App.1984) (holding that federal employee's statement that a third party would not seek a refund for airline tickets she had purchased and that the government considered the matter closed were predictions or opinion).

■■■ Despite the general rule that fraudulent statements must be about past or existing facts, Minnesota courts allow a cause of action for fraud to exist where the defendant makes a statement about the capabilities of its product. *See Clements Auto. Co. v. Service Bureau Corp.,* 444 F.2d 169, 181–82 (8th Cir.1971); *National Equip. Corp. v. Volden,* 190 Minn. 596, 598, 252 N.W. 444, 445 (1934); *Wisconsin Mystic Iceless Refrigerator v. Minnesota Mystic Iceless Refrigerator,* 180 Minn. 334, 336, 230 N.W. 796, 797 (1930); *Schmitt v. Ornes Esswein & Co.,* 149 Minn. 370, 371–72, 183 N.W. 840, 841 (1921). In *Schmitt,* the plaintiff alleged that the defendant had told him that an ice machine was "as good as new, and could and would afford a sufficient degree of refrigeration to keep meat from spoiling." 149 Minn. at 371, 183 N.W. at 841. In holding that this statement was about present facts, the Minnesota Supreme Court explained:

> defendant contends that, as pleaded, its representation amounted merely to a prediction that the machine would produce

certain results in the future; that it was only an expression of opinion and not an assertion of a past or existing fact, and hence will not support a charge of fraud. We think the contention cannot be sustained. The essence of the representation was an affirmation that the machine was capable of reducing the temperature to a point low enough to keep meat from spoiling. It was more than a prediction of expression of opinion. It was a statement respecting the inherent capacity or power of the machine. Such a statement is one of existing fact, and, if made with knowledge of its falsity, and with intent to deceive the person to whom it is made, amounts to an actionable fraud, if such person relied upon and was actually deceived by it.

*Id.; see also Clements*, 444 F.2d at 181–82 (finding that defendant's statements that its data processing system would be capable of providing the plaintiff with sufficient information, and that it would be an effective and efficient tool used in inventory control were statements of present fact); *National Equip.*, 190 Minn. at 599, 252 N.W. at 445 (holding that defendant's representations that its dumptor would work in cooperation with other machines that plaintiff had and that it would surpass any machine being used by the plaintiff were representations of present facts); *Wisconsin Mystic Iceless Refrigerator*, 180 Minn. at 334, 230 N.W. at 796 (holding that representations that defendant's iceless refrigerator operated successfully without ice or other cooling devices or materials and that it would preserve food in the warmest weather constituted fraud).

█ In the Fact Section of this Memorandum Opinion and Order, the Court listed 18 representations that Forest claims Ligna and Jocar made about their design capabilities and sawmill equipment. After reviewing this list, the Court finds that the following representations are not actionable because they are statements of future facts or predictions of future events:

(1) that Forest would be totally satisfied with Ligna's sawmill design and equipment (2nd L. Doose Aff. ¶ 17(B));

(2) that Landers, Ligna's chief engineer, would design Forest's project and see it through complete engineering, manufacture, installation, and start-up (*Id.* ¶ 17(E));

(3) that Wilson guaranteed that Ligna would stand 100% behind its design and equipment that was sold to Forest (*Id.* ¶ 17(H));

(4) that Ligna would deliver on time and in a sequence that would permit the orderly installation of equipment (*Id.* ¶ 17(I));

(5) Jocar—if you don't like it, you don't keep it (*Id.* ¶ 18 & Ex 1 (Defendants' advertising).)

█ In addition, the Court finds that the following statements are not actionable because they are merely statements of opinion, and not statements of present or past facts:

(1) that Ligna and Jocar's equipment was reliable and ideal for Forest's proposed use (2nd L. Doose Aff. ¶ 17(B));

(2) that Landers was one of the best sawmill designers in the country (*Id.* ¶ 17(E));

(3) Jocar's band headsaw and resaws ... quality manufacturing ... extremely tough ... economically priced (*Id.* ¶ 18 & Ex. 1 (Defendants' advertising));

(4) Jocar—very strong, fast and efficient (*Id.*);

(5) Jocar—easy to work due to its simplicity (*Id.*);

(6) Jocar—very robust and efficient machine and well constructed (*Id.*);

(7) Jocar—innovative and technologically advanced to reduce maintenance and repair costs (*Id.*);

(8) extremely profitable to switch to a Bank Headrig. (*Id.*)

█ The Court, therefore, will grant the Defendants' Motions with respect to the above listed representations that form a basis of Forest's fraud claims. Accordingly, the following statements remain as part of Forest's fraud claim because they are statements of present or past facts:

(1) that the mill design and that the Ligna and Jocar equipment quoted will consistently produce at least 40,000 board feet of pallet lumber per shift (2nd L. Doose Aff. ¶ 17(A));

(2) that Ligna and Jocar's equipment was tested (*Id.* ¶ 17(B));

(3) that Ligna's customers have been totally satisfied with Ligna's sawmill design and products (*Id.* ¶ 17(C));

(4) that Ligna had a well trained and talented staff of engineers designing sawmills and sawmill equipment (*Id.* ¶ 17(D));

(5) that Landers was Ligna's chief engineer (*Id.* ¶ 17(E));

(6) that Landers had extensive experience in designing complete sawmills of the nature that Forest was considering (*Id.* ¶ 17(F));

(7) that Ligna and Jocar's products were unconditionally guaranteed (*Id.* ¶¶ 17(G) & (K));

(8) that the mill will perform to Forest's specifications within 30 to 60 days of start-up (*Id.* ¶ 17(J));

(9) that band mills produce approximately 10% more lumber from any given log diameter in comparison to circle head saws. (*Id.* ¶ 18 & Ex. 1).

## 2. *Scienter*

Ligna argues that Forest's fraud claim should be dismissed because Forest has not created a genuine issue of material fact regarding whether Wilson and Ligna knew the statements they made to Forest were false. (Ligna's Supp. Mem. at 16; Ligna's Reply Mem. at 5–6.)

In order to establish its fraud claim, Forest must show that the party who made the misrepresentation knew that it was false, or that it was asserted "as of the [party's] own knowledge when he or she does not know in fact whether it is true or false." *Florenzano v. Olson,* 387 N.W.2d 168, 173 (Minn.1986). This element of fraud is rarely proven directly, but is normally established through circumstantial evidence. *Id.*

The Court has reviewed the evidence to which the parties cite regarding Wilson's knowledge of the falsity of his statements, and it finds, that with respect to three representations, Forest has failed to create a gen-

uine issue of material fact regarding whether Wilson knew that the alleged representations were false, or whether he asserted them as of his knowledge when he did not know whether they were true or false. They are: (1) that Ligna's equipment was tested; (2) that Ligna's customers were totally satisfied with Ligna's sawmill design and products; and (3) that Ligna and Jocar's equipment was unconditionally guaranteed. With respect to the remaining representations, the Court finds that genuine issues of material fact exist regarding whether Wilson knew that the statements were false, or whether he made as of his own knowledge them without knowing whether they were true or false.

 Forest claims that Wilson told it that Ligna and Jocar's equipment was tested, when it was not. As evidence of Wilson's knowledge of the falsity of this statement, it merely cites to a portion of Mike Richardson's deposition, in which he states that he did not believe that all of Ligna's equipment was adequately tested.[11] (Pl.'s Mem. in Opp'n to Ligna at 7.) This evidence is insufficient to create a genuine issue of material fact on this issue.

 Forest also claims that Wilson told it that all of Ligna's customers have been totally satisfied with Ligna's sawmill designs and equipment, when they all have not been and when at least one other customer has sued Ligna. As evidence of Wilson's knowledge of the falsity of this statement, Ligna points to the fact that anther customer, Cranberry Lumber, sued Ligna over its sawmill design and equipment. (Pl.'s Mem. in Opp'n to Ligna at 7–8.) Cranberry's mill, however, did not begin operations until late November 1994, a month after Ligna and Forest entered into their equipment contract. (Barns Aff. Ex. K ¶ 6 (Jarrell Aff.).) Wilson could not have known that Cranberry was not satisfied with its mill or with Ligna's equipment at the time that Forest alleges that Wilson made this representation to them—before they entered into their equipment contract—because the Cranberry mill was not operat-

---

11. Forest cited to additional evidence to support this portion of their fraud claim, (*see* Forest's Mem. in Opp'n to Ligna at 7), but none of this evidence dealt with the issue of the adequacy of the testing done on Ligna's or Jocar's equipment.

ing at this time. Thus, Forest has failed to present any evidence that Wilson knew that any Ligna customer was not totally satisfied with Ligna's work, or that·he made this statement as of his own knowledge without knowing that it was true or false.

Forest also claims that both Wilson and Jocar, through their advertising, told it that Ligna and Jocar's equipment was unconditionally guaranteed. As evidence of the fact that Wilson and Jocar knew that this statement was false, Forest points to that facts that the Defendants did not stand behind this guarantee and fix all of the problems with their equipment after Forest notified them of problems with it, and that problems with both Ligna and Jocar's equipment continue today. (Pl.'s Mem. in Opp'n to Ligna at 9–10.) The fact that the Defendants have not cured all of the problems with their equipment, however, is not evidence, that at the time these representations were made, the speaker knew that the statement was false, or made the statement as of his own knowledge without knowing whether it was true or false. Ligna, therefore, has failed to create a genuine issue of material fact regarding whether Wilson or Jocar knew that their statements that their equipment was unconditionally guaranteed were false, or that they made the statements as of their own knowledge without knowing whether they were true or false.

Accordingly, the Court will grant the Defendants' Motions with respect to the portion of Forest's fraud claim involving Wilson's representations that Ligna and Jocar's equipment was tested and that Ligna's customers were totally satisfied with Ligna's sawmill design and products and the portion of Forest's fraud claim involving Wilson and Jocar's representations that their equipment was unconditionally guaranteed.

### 3. *Justifiable Reliance*

Ligna argues that Forest's fraud claim should be dismissed because there is no evidence that Forest reasonably relied upon any of Wilson's or Ligna's representations. (Ligna's Supp. Mem. at 17–21.) Ligna contends that Forest was a "sophisticated player with expansive knowledge about various as-

pects, as well as risks, of sawmill operation," and that it conducted an independent investigation into Ligna's equipment, so it could not have reasonably relied upon Wilson's representations. (*Id.*)

As part of its fraud claim, Forest must show that it justifiably relied to its detriment upon Wilson's representations. *Davis v. Re–Trac Mfg. Corp.,* 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967). "[T]he question to be asked when determining reasonable reliance is 'not whether the representation would deceive that average man ... (but rather) whether the representations were ... calculated to deceive... a person of the capacity and experience of the particular individual' who received the representation." *Berg v. Xerxes–Southdale Office Bldg.,* 290 N.W.2d 612, 616 (Minn.1980) (quoting *Spiess v. Brandt,* 230 Minn. 246, 254, 41 N.W.2d 561, 567 (1950)); *see also Boubelik v. Liberty State Bank,* 553 N.W.2d 393, 400 (Minn.1996) (noting that "fraud is to be proved with reference to specific intelligence and experience of the aggrieved party rather than the reasonable person standard"). In addition, "a purchaser cannot undertake an independent investigation, rely upon the information obtained, and later successfully assert that he was misled." *Goldfine v. Johnson,* 208 Minn. 449, 452, 294 N.W. 459, 460 (1940). The question of whether a party justifiably relied upon another's representations is a question of fact for the jury. *Id.*

The Court finds that genuine issues of material fact exist regarding whether Forest justifiably relied upon Wilson's or Ligna's representations. While it is true that the Dooses had been in the sawmill business for 15 years when they contracted with Ligna for sawmill design services and equipment, it is also true that the Dooses had never designed an entire mill before, that they had never milled the type of lumber that they wanted to produce in Mill C, and that they had no knowledge of and had never used the type of equipment that they bought from Ligna.

To support its contention that Forest did not justifiably rely upon Wilson's or Ligna's representations, Ligna also relies

upon the facts that Forest visited several mills that used Ligna products, as well as several mills that used another company's equipment, and talked to their owners about their view of Ligna equipment. These mills, however, did not contain much of the equipment that Forest eventually bought from Ligna, such as the Jocar bandsaw and the Jocar horizontal resaw. Ligna fails to explain how this investigation could have revealed the falsity of many of Wilson's and Ligna's representations, such as Lander's education and experience, or the individual capability of the individualized mill and equipment that Ligna designed and sold to Forest. "Where a party to whom a representation has been made has not made an investigation adequate to disclose the falsity of the representation, the party whose misstatements have induced the act cannot escape liability by claiming that the other party ought not to have trusted him." *Commercial Property Investments, Inc. v. Quality Inns International, Inc.*, 938 F.2d 870, 876 (8th Cir.1991) (citation omitted). Because genuine issues of material fact exist, the Court will deny the Defendants' Motions with respect to their claim that Forest cannot establish that it justifiably relied upon Ligna's and Wilson's representations.

To conclude, the Court finds that Forest will be allowed to present a fraudulent misrepresentation claim to the jury that includes the following representations that Wilson and Ligna allegedly made:

(1) that the mill design and that the Ligna and Jocar equipment quoted will consistently produce at least 40,000 board feet per shift;

(2) that Ligna had a well trained and talented staff of engineers designing sawmills and sawmill equipment;

(3) that Landers was Ligna's chief designer;

(4) that Landers had extensive experience in designing complete sawmills of the nature that Forest was considering;

(5) that the mill would perform to Forest's specifications within 30 to 60 days of start-up; and

(6) that band mills produce approximately 10% more lumber from any given log diameter in comparison to circle head saws.

### C. Jocar and Ligna's Relationship

■ Jocar argues that Forest's fraud claim against it should be dismissed because Forest has not identified any alleged fraudulent representations that Jocar made to Forest. (Jocar's Supp. Mem. at 15–16.) Jocar also contends that Forest has failed to establish that Ligna is Jocar's agent, and therefore, Jocar cannot be liable for the representations that either Wilson or Ligna made. (*Id.* at 16–17.)

The Court has reviewed the representations that remain as a part of Forest's fraud claim, and it finds that the record reveals that either Wilson, or Ligna, through its advertising, allegedly made each of these representations. Forest has not identified any allegedly fraudulent representations that Jocar directly made to it. Thus, in order for Jocar to be liable for Ligna's or Wilson's representations, Ligna must be Jocar's agent.[12]

■ Under Minnesota law, an "agency relationship is 'the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Church of the Nativity of Our Lord v. WatPro*, 491 N.W.2d 1, 5–6 (Minn.1992) (quoting Restatement (Second) of Agency § 1 (1958)). When the circumstances involve a party who sells another party's product, factors to be considered in making this determination in-

12. In its September 2, 1997 Memorandum Opinion and Order, this Court denied Jocar's Motion to Dismiss for Lack of Personal Jurisdiction. In doing so, this Court found that Ligna's contacts with Jocar could be attributed to Jocar because Ligna was Jocar's agent. *See* Sept. 2, 1997 Mem. Op. and Order at 13–14. That determination, however, was made on a very limited record. The Court believes that discovery has revealed new facts about the nature of the relationship between Ligna and Jocar, and thus, this Court will make an independent determination of the issue of whether Ligna is Jocar's agent. Although the Court now believes that the record does not support a finding that Ligna is Jocar's agent, Jocar had sufficient contacts of its own with Minnesota for this Court to exercise personal jurisdiction over it.

clude whether the alleged agent acquires absolute ownership and title of the goods before selling them to a third party, and whether the alleged principal has control over where the alleged agent can sell the goods, to whom she can sell them, and for what price. *See Louis DeGidio Oil & Gas Burner Sales and Serv., Inc. v. Ace Eng'g Co., Inc.,* 302 Minn. 19, 25, 225 N.W.2d 217, 221–22 (1974). Whether a party is an agent is a question of fact for the jury. *Jurek v. Thompson,* 308 Minn. 191, 196, 241 N.W.2d 788, 791 (1976).

Jocar claims that there is not sufficient evidence upon which a reasonable jury could conclude that Jocar controlled Ligna with respect to Ligna's sale of Jocar products. As evidence of this, it points out that: (1) Jocar had no control over the price that Ligna charged its customers for Jocar's product, and Jocar usually did not know how much Ligna charged its customers for Jocar's goods; (2) Jocar did not see any of the quotations and purchase orders that went back and forth between Jocar and Forest as they negotiated their contract; (3) Ligna obtained absolute title to the equipment it bought from Jocar, and paid Jocar about 80% of the purchase price for the goods when Jocar delivered the goods to Ligna; (3) Jocar in no way restricted or controlled the parties to whom Ligna sold Jocar equipment; (4) Jocar did not control or even see the ads that Ligna created about Jocar's products; (5) in describing Ligna's relationship with Jocar, Wilson stated that Jocar provided Ligna with equipment and that Ligna resold that equipment to others; and (6) Ligna and Jocar did not enter into projects jointly with each other. (Jocar's Supp. Mem. at 17–18; Jocar's Reply Mem. at 2–3.)

Forest argues that the following evidence demonstrates that Ligna was acting as Jocar's agent and that Jocar controlled Ligna: (1) Jocar allowed Ligna to use Jocar advertising and to exhibit Jocar equipment at industry trade shows; (2) during the summer of 1994, Ligna communicated with Jocar about the questions Forest had about Jocar's equipment, and Ligna asked Jocar questions about the capabilities of its equipment; (3) Ligna sent Jocar the designs for the sawmill that Ligna had prepared; (4) Jocar person-

nel made three trips to assist in the installation and repair of equipment at Mill B; (5) Ligna and Jocar exchanged over 100 pieces of correspondence regarding the problems at Mill B; and (6) in a September 11, 1995 letter from Jocar to Yvonne Doose, Jocar stated "we shall always be at your disposal for all the information and assistance that you may need, directly or through our excelent (sic) agent in the U.S.A. Ligna Machinery, Inc." (Pl.'s Mem. in Opp'n to Jocar at 22–23.)

The Court finds that Forest has failed to create a genuine issue of material fact regarding whether Ligna was Jocar's agent. Although Forest has pointed to a large amount of evidence about the communication and interaction that Jocar had with Ligna regarding Jocar's sawmill equipment, none of this evidence demonstrates that Jocar controlled any of Ligna's actions with respect to selling Jocar equipment. Rather, Jocar was merely conveying information to Ligna about its equipment. The record demonstrates that Ligna bought sawmill equipment from Jocar, obtained title to it, and then sold it to third parties, and that Jocar in no way controlled where, to whom, or for how much Ligna resold its product. *See DeGidio,* 302 Minn. at 25, 225 N.W.2d at 221–22. The Court does not believe the fact that Jocar, a Portugese company, once referred to Ligna as its agent is sufficient evidence upon which a reasonable jury could conclude that an agency relationship existed between the parties. Accordingly, the Court will grant Jocar's Motion with respect to Forest's fraud claim.

### III. Negligence and Negligent Design

The Defendants argue that Forest's claims for negligence and negligent design should be dismissed because Forest has not identified any duties that the Defendants owed Forest with respect to the design of the sawmill or the manufacture of the sawmill equipment, apart from their duties under the contracts. Forest, the Defendants contend, cannot recover for negligent breach of contract under Minnesota law.

In order to bring a claim of negligence under Minnesota law, the plaintiff

must show that the defendant owed her a duty which the defendant breached. *See Johnson v. State*, 553 N.W.2d 40, 48 (Minn. 1996). Minnesota, however, does not recognize a cause of action for negligent breach of contract; thus, the duty that a plaintiff claims the defendant owes her must arise from an obligation outside a contract between the parties. *See Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn.1983) (holding that Minnesota did not recognize cause of action for negligent breach of contract and that it was error for the district court to submit theory of negligence to jury where duties between parties only arose out of the contract). If, however, the defendant owes the plaintiff a duty separate from its obligations under the contract, the plaintiff can bring claims for negligence and for breach of contract. *See Arden Hills North Homes Ass'n v. Pemtom, Inc.*, 475 N.W.2d 495, 500 (Minn.Ct.App.1991) (allowing plaintiff to bring negligence claim against builder because contractor "has a duty, independent of the contract itself, to erect a building in a workmanlike manner"), *aff'd as modified by* 505 N.W.2d 50 (Minn.1993).

■■■■ Under Minnesota law, "one who undertakes to render professional services is under a duty to the person for whom the service is to be performed to exercise such care, skill, and diligence as men in that profession ordinarily exercise under the circumstances." *City of Eveleth v. Ruble*, 302 Minn. 249, 253, 225 N.W.2d 521, 524 (Minn.1974). This duty applies to design engineers. *See id.* (holding engineering firm that contracted to design a water treatment facility owed duty to the city for whom it performed its design services). Accordingly, the Court finds that Forest can maintain a claim for negligent design of the sawmill against Ligna because Ligna owed a duty to perform its design services using the care, skill, and dili-

gence that sawmill designers ordinarily exercise.[13]

■■ Forest contends that Jocar, Ligna, and Wilson owed it a duty to "exercise reasonable care in connection with the design, manufacture, marketing and sale of the sawmill equipment ...." (Compl.¶ 48.) This Court cannot find, and Forest has not identified, any case law holding that an equipment manufacturer owes a duty to the buyer of its equipment to exercise reasonable care in manufacturing and designing its product.[14] Relying on *Pemtom*, Forest contends that "under Minnesota law, it is clear that one performing a contract has a duty independent of the contract itself to perform the work in a reasonably good and workmanlike manner." (Pl.'s Mem. in Opp'n to Jocar at 26.) The *Pemtom* court, however, stated that "Minnesota law holds that *a contractor* has a duty, independent of the contract itself, *to erect a building in a reasonably good and workmanlike manner.*" 475 N.W.2d at 500 (emphasis added). *Pemtom* is inapposite to the instant case, which involves the design and manufacture of sawmill equipment, not the construction of a building. The Court finds that the Defendants did not owe Forest a duty in their design and manufacture of their sawmill equipment. The Court, therefore, will grant the Defendants' Motions with respect to Forest's negligence claim (Count IV), and it will grant Wilson's Motion with respect to Forest's negligent design claim (Count V), but it will deny Ligna's Motion with respect to Forest's negligent design claim (Count V).

## IV. Breach of Implied and Express Warranties [15]

■■ Forest claims that Ligna and Jocar breached the implied warranties of fitness for a particular purpose and merchantability because the sawmill equipment that they sold to Forest was neither fit for the particular

13. Because the record does not indicate that Wilson himself designed Mill B or that he told Forest that he would design it, the Court finds that Wilson did not owe a duty to Forest with respect to the design of Mill B.

14. The Court recognizes that a manufacturer owes some duties to the buyer of its product, such as the duty not to manufacture products

that are unreasonably dangerous and defective. Such a claim is not alleged in the instant case.

15. Forest has agreed to voluntarily dismiss its contract (Counts I & II) and warranty claims (Counts VI–VIII) against Wilson individually. (Pl.'s Mem. in Opp'n to Ligna at 2 n. 2.)

purpose for which the parties contemplated that it would be used nor fit for the ordinary purposes for which such goods are used. (Compl.¶¶ 55–63.) In addition, Forest claims that Ligna and Jocar breached express warranties that they had made to Forest about the capabilities of their sawmill equipment. (*Id.* ¶¶ 64–67.)

Ligna and Jocar argue that Forest's claim for breach of implied and express warranties should be dismissed because the contract between Ligna and Forest effectively disclaimed all express and implied warranties. (Ligna's Supp. Mem. at 22–23; Jocar's Supp. Mem. at 20–21.) They further contend that Forest's damages for breach of contract should be limited to repair and replacement of defective parts, as agreed to in the contract between Forest and Ligna. (Ligna's Supp. Mem. at 23; Jocar's Supp. Mem. at 21–22.)

All of the quotations that Ligna sent Forest contained "Conditions of Sale" on the back side of the quotation. Paragraph 17 of the "Conditions of Sale" read:

> Warranty: Seller warrants that all equipment and parts described hereunder and sold to the Purchaser will be free from defects in material and workmanship under normal use and under proper maintenance. This warranty is extended from the date of delivery for the respective product categories as defined below.
>
> | Product Category | Warranty Period |
> |---|---|
> | New machinery and parts | 60 days |
> | Rebuilt machinery and parts | 30 days |
> | Parts Specified "As is" condition | NO WARRANTY |
>
> All machinery components such as motors, contacts, bearings, etc. are warranted as long as the original manufacturer's warranty, if any, is in force. Seller's liability to the Purchaser to repair and replace such products or parts proven to be defective as to materials or workmanship is the sole and exclusive remedy of the Purchaser. . . .
>
> THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OR MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, PERFORMANCE OR OTHERWISE.

(Jorstad Aff. Ex. J (Ligna Conditions of Sale).)

Ligna's Quotation No. 4806, which was dated October 28, 1994, contained the following provision:

> LIGNA MACHINERY, INC. agrees to modify item # 17 under "Conditions of Sale" as listed on reverse side of page one of our quotation # 4806. We will extend the warranty period from 60 days to six months on our workmanship only. All other terms and conditions as listed in item 17 still apply.

(Jorstad Aff. Ex. I at 7 (Quotation # 4806).)

In its February 24, 1997 Memorandum Opinion and Order denying Ligna's Motion to Dismiss for Lack of Subject Matter Jurisdiction or to Transfer, this Court ruled that Ligna's Quotation No. 4487, dated October 6, 1994, did not constitute an offer and that Forest did not accept this offer, based upon the manner that the quotation described for accepting the offer and creating a contract between the parties. *See* Feb. 24, 1997 Mem. Op. and Order at 7–12. Accordingly, the Court found that the venue provision contained in the terms and conditions of Quotation No. 4487 was not part of the contract between the parties. *Id.* In conjunction with this Motion, Larry Doose submitted an affidavit to the Court stating that Forest did not agree with and did not accept the terms and conditions contained in any of Ligna's quotations. (1st L. Doose Aff. ¶¶ 14–16, 21.) Subsequent to making this affidavit, Larry Doose testified during his deposition that Forest did accept the front side of Ligna's Quotation No. 4806, dated October 28, 1994, in which Ligna stated that it was willing to modify the length of the warranty on the workmanship of its equipment to 6 months, but that all other terms and conditions contained in Paragraph 17 remained in effect. (L. Doose Dep. 282:15–285:18; *see supra* at 901–02 (outlining exact testimony from Larry Doose's deposition).)

Because Larry Doose testified during discovery, in direct contradiction to prior statements in his affidavit, that Forest accepted certain portions of Ligna's Quotation No.

4806, the Court believes that it is appropriate to revisit the issue of whether any of the terms and conditions of Ligna's Quotations formed part of the contract between the parties. Based upon Larry Doose's unambiguous statement that Forest did accept the front side of Quotation No. 4806, where Ligna agreed to extend the warranty period from 60 days to six months on its workmanship only and stated that all other terms and conditions as listed in item 17 still applied, the Court finds that Paragraph 17 of the "Conditions of Sale" in Quotation No. 4806, modified to extend Ligna's warranty of workmanship on its sawmill equipment to 6 months, is part of the contract between Ligna and Forest for sawmill equipment.

The Court finds that Paragraph 17 effectively disclaimed all implied warranties, including the warranties of fitness for a particular purpose and merchantability. The disclaimer was in writing, it was conspicuous, and it mentioned merchantability. *Transport Corp. of Am. v. IBM*, 30 F.3d 953, 959 (8th Cir.1994) (holding that a contract validly disclaimed all implied warranties because it was in writing, conspicuous, and mentioned merchantability); *see also* Minn.Stat. § 336.2–316(2) (1998). The Court, therefore, will grant the Defendants' Motions with respect to Forest's claims for breach of the implied warranty of fitness for a particular purpose (Count VI) and for breach of the implied warranty of merchantability (Count VII).

▮ Jocar and Ligna also argue that the disclaimer of warranties in Paragraph 17 complies with the requirements of Minnesota law for disclaiming express warranties. (Jocar's Supp. Mem. at 19–20; Ligna Supp. Mem. at 23.) The Defendants, however, in making these arguments, ignore the fact that Minnesota law differs on how a party can effectively disclaim express, as compared to implied, warranties.

▮ Under Minnesota law, an "express warranty may arise from an affirmation of fact or promise or a description of the goods made by the seller to the buyer which become part of the basis of the bargain." *NSP v. ITT Meyer Indus.*, 777 F.2d 405, 411 (8th Cir.1985) (finding that defendant created express warranty through statements that its product would perform according to specifications). It is a question of fact whether an express warranty arises from the language and circumstances of a transaction. *Id.* If a defendant has made an express warranty, but has also attempted to disclaim its warranties, courts must determine whether the express warranty conflicts with the disclaimer, or whether they can be construed consistently with one another. *See NSP*, 777 F.2d at 412; *see also* Minn.Stat. § 336.2–316(1) (1998).[16] If a "defendant's express warranty and its disclaimer cannot be reasonably reconciled with one another ..., the language of the express warranty must prevail." *Wenner v. Gulf Oil Corp.*, 264 N.W.2d 374, 384 (Minn.1978); *see also NSP*, 777 F.2d at 412 (holding that trial court properly determined that defendant's disclaimer of express warranties conflicted with its statements that its equipment would perform according to technical specifications, and therefore, disclaimer did not effectively limit plaintiff's ability to recover for breach of express warranty); *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 917 (Minn.1990) (holding that plaintiff could recover for breach of express warranty where defendant made express warranties about the capabilities of its engine, but the contract between the parties stated "there is no other express warranty" beside the defendant's written, limited warranty in the contract, which was different than the express warranties made to the plaintiff).

In the instant case, Forest contends that Jocar and Ligna made specific representations to it that their sawmill design and equipment would meet certain specifications and would perform at certain rates.

---

**16.** Minnesota Statutes Section 336.2–316(1) provides:

words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with

each other; but subject to the provisions of this article on parol or extrinsic evidence (section 336.2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(Compl. ¶ 65.) The contract between Forest and Ligna contains a limited warranty on workmanship and defects in material, and states that this warranty "is exclusive and in lieu of all other express and implied warranties . . . ." (Jorstad Aff. Ex. J.) The Court finds that the Defendants' statements regarding the capabilities of their equipment and their attempt to limit any express warranties cannot be read consistently. Moreover, the Defendants have not shown that the written contract contains an integration clause, stating that the parties intend the writing to be the final expression of their agreement. "When the terms of an express warranty and a disclaimer cannot be reconciled, the language of the express warranty prevails." *Hydra–Mac*, 450 N.W.2d at 917. Accordingly, the Court finds that the Defendants did not validly disclaim any express warranties that Forest alleges they made.

Jocar contends that if it did not disclaim any express warranties, the Court should dismiss Forest's claim for breach of express warranties against it because Forest has not identified any statements that Jocar made directly to Forest that could be construed to create an express warranty. (Jocar's Supp. Mem. at 21.) Forest responds that Ligna is Jocar's agent, and thus, Ligna's express warranties are attributable to Jocar. (Pl.'s Mem. in Opp'n to Jocar at 29.) The Court has already determined that Ligna was not Jocar's agent. *See supra* Section II C. Because Forest has not identified any statement that Jocar directly made that created an express warranty, the Court will grant Jocar's Motion with respect to Forest's claim for breach of express warranties (Count VIII), but it will deny Ligna's Motion with respect to this claim.

**V. Limitation of Damages**

 Ligna argues that Forest is barred from seeking damages for its breach of warranty claim beyond the costs associated with repair or replacement of defective products or parts because the contract between the parties contained a provision limiting the available remedies.[17] (Ligna's Supp. Mem. at 23.) Forest contends that this section is not enforceable because the limitation of damages fails of its essential purpose. (Pl.'s Mem. in Opp'n to Ligna at 33.)

 Under Minnesota law, a contract for the sale of goods can limit a buyer's remedies "to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts." Minn.Stat. § 336.2–719(1)(a) (1998). If such a limited remedy is "expressly agreed to be exclusive, . . . it is the sole remedy." *Id.* § 336.2–719(1)(b). If, however, "circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter." *Id.* § 336.2–719(2). An exclusive remedy fails of its essential purpose "if circumstances arise to deprive the limiting clause of its meaning or one party of the substantial value of its bargain." *Transport Corp. of Am. v. IBM*, 30 F.3d 953, 959 (8th Cir.1994). "So long as the seller repairs the goods each time a defect arises, a repair-and-replacement clause does not fail of its essential purpose. But if repairs are not successfully undertaken within a reasonable time, the buyer may be deprived of the benefits of the exclusive remedy." *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 356 (Minn.1977); *see also Transport Corp.*, 30 F.3d at 959 (noting that "a repair or replacement claim does not fail of its essential purpose so long as repairs are made each time the defect arises").

---

**17.** In its Reply Memorandum, Ligna indicates that it "incorporates by reference" the arguments made by Jocar regarding why Forest's claim for consequential damages should be barred. (Ligna's Reply Mem. at 9 n. 5.) Because Ligna attempts to raise these arguments for the first time in its Reply Memorandum, the Court will not address them. *Resolution Trust Corp. v. Armbruster*, 52 F.3d 748, 751 n. 2 (8th Cir.1995). Not only has Forest not had an adequate opportunity to respond to them, but many of Jocar's arguments with respect to these issues were based upon facts specific to Jocar, such as the fact that the majority of the problems with the Jocar equipment were allegedly fixed by a certain date. Thus, Ligna cannot simply adopt them as their own and argue that they apply with equal force to Forest's claims against it. This, however, does not preclude Ligna from arguing at trial that Forest is not legally entitled to certain damages that it seeks.

In the instant case, factual disputes remain regarding whether the equipment that Ligna sold Forest performed according to both the terms of the contract and to Ligna's representations, and regarding whether Ligna has been able to repair its equipment such that it meets these terms and specifications. This factual dispute precludes the Court from granting Ligna's Motion with respect to the limitations of damages provision. The Court, therefore, will deny Ligna's Motion with respect to its contention that Forest's damages for its warranty claim are limited to repair and replacement of the defective equipment.

## Conclusion

Accordingly, based on the foregoing, and upon all the files, records, and proceedings herein, **IT IS ORDERED** that:

(1) Jocar's Motion for Summary Judgment (Doc. No. 64) is **GRANTED**, and Plaintiff's Complaint is **DISMISSED WITH PREJUDICE** with respect to Jocar;

(2) Ligna and Wilson's Motion for Partial Summary Judgment (Doc. No. 67) is **GRANTED IN PART** with respect to Plaintiff's claims for breach of implied warranties (Counts VI & VII), negligence (Count IV), and negligent design (Count V) alleged against Wilson, and Plaintiffs' claims for breach of implied warranties (Counts VI & VII) and negligence (Count IV) are **DISMISSED WITH PREJUDICE** with respect to both Defendants and Plaintiff's claim for negligent design (Count V) is **DISMISSED WITH RESPECT** to Wilson only; and

(3) Ligna and Wilson's Motion for Partial Summary Judgment (Doc. No. 67) is **DENIED IN PART** with respect to Plaintiff's claims for negligent design (Count V) alleged against Ligna, breach of express warranties (Count VIII), and the portion of plaintiff's fraud claim (Count III) involving the representations listed on page 39 of this Memorandum Opinion and Order.