### TAYLOR INVESTMENT CORPORATION, Plaintiff,

v.

### Dennis L. WEIL, Construction Management and Consulting, Inc., and Geac Computers, Inc., Defendants.

### No. CIV 98–2632 JRT/FLN.

United States District Court, D. Minnesota.

March 31, 2001.

dants Dennis L. Weil and Construction Management and Consulting, Inc.

Daniel J. Gendreau and Raphael T. Wallander Rider, Bennett, Egan & Arundel, L.L.P., Minneapolis, MN, for defendant Geac Computers, Inc.

## MEMORANDUM OPINION AND ORDER

TUNHEIM, District Judge.

This matter is before the Court on defendant Geac Computers Inc.'s ("Geac") motion for declaratory judgment and for dismissal of the claims of Taylor Investment Corporation ("Taylor") for lack of subject matter jurisdiction. Also before the Court is Geac's motion to dismiss the cross-claims of Dennis L. Weil ("Weil") and Construction Management and Consulting, Inc. ("CMAC") pursuant to Fed. R.Civ.P. 12(b)(3). Defendants' Weil and CMAC also move for partial summary judgment on Taylor's statutory and common law fraud claims. For the reasons set forth below, the Court grants Geac's motion to dismiss for lack of subject matter jurisdiction, denies Geac's motion to dismiss the cross-claims of Weil and CMAC, and grants the motion of Weil and CMAC for partial summary judgment.[1]

## BACKGROUND

Taylor is engaged in the business of developing and marketing recreational real estate. In September 1995, Taylor sent a request for proposal ("RFP") to several vendors of software and computing services in the construction industry outlining its requirements for a new business computer system. The RFP required a Microsoft Windows-based system comprised of a variety of software applications that would

Stephen J. Davidson and Jeffrey E. Grell, Leonard, Street and Deinard, P.A., Minneapolis, MN, for plaintiff.

V. John Ella, Mansfield, Tanick & Cohen, P.A., Minneapolis, MN, for defen-

---

1. Although plaintiff's Amended Complaint still contains claims for common law and statutory fraud against Geac, the Court notes those claims (Counts I and II of plaintiff's Amended Complaint) have already been dismissed with prejudice.

provide networked integration of Taylor's sales, land acquisitions and financial operations and would transfer data from its field sales offices to its headquarters in Minneapolis. Defendant CMAC was one of the vendors who received and responded to Taylor's RFP.

CMAC is engaged in the business of developing and marketing computer systems for the construction industry and providing project management and integration services in connection with those systems. Weil is the president of CMAC. At all relevant times to these proceedings, CMAC was a value added reseller ("VAR") of software produced by Geac. As a VAR, CMAC was authorized to modify and distribute Geac software to CMAC's customers as a part of a total package including other software, computer hardware, and computing services.

After reviewing a variety of bids from computer systems developers, Taylor contracted with CMAC for its services on December 8, 1995. CMAC charged Taylor a total of $230,000 for the entire package of products and services it provided to Taylor. A core component of the software package that CMAC presented to Taylor during the bidding process was a newly developed Microsoft Windows-compatible software product from Geac called "StarBuilder." The itemized cost of StarBuilder to Taylor was $20,000. This amount included a cost of $10,000 that CMAC paid to Geac for the product, as well as an additional $10,000 mark-up that CMAC kept for itself.

The StarBuilder product constitutes the Windows-based version of a Microsoft DOS-based product licensed by Geac called "CS2000." In November 1995, when Weil presented CMAC's package to Taylor, Geac had been marketing CS2000 for an extended period of time with positive customer responses indicating that it was a reliable and stable product. Star-Builder, however, was still in an incomplete stage of development. Weil nevertheless marketed StarBuilder to Taylor using CS2000 to demonstrate StarBuilder's expected capabilities. Weil also presented Taylor with various promotional materials provided to CMAC by Geac, including a StarBuilder product brochure and an incomplete "demo version" of Star-Builder. An internal memorandum issued by Geac to its sales force indicates that Weil's tactic of using CS2000 along with these other promotional materials to demonstrate StarBuilder was a marketing strategy approved by Geac while Star-Builder was still in development.

During his marketing presentations, Weil informed Taylor's employees that the development of StarBuilder was unfinished. Taylor therefore was aware that the CS2000 product demonstrated by Weil was not the same product as StarBuilder. Taylor was also aware, when it signed the contract with CMAC in December 1995, that the development of StarBuilder was incomplete. Nevertheless, Weil represented to Taylor that StarBuilder was "virtually" complete and that it would be available to customers by January 1996. Weil also stated that StarBuilder was expected to be as reliable and stable as CS2000. Weil avers that he made these statements solely on Geac's representations to him. Neither Weil nor Taylor has produced specific evidence, however, of what Geac's representations to Weil precisely were. At no time during the negotiation process did Geac communicate directly with Taylor about the stability or development status of Star-Builder.

According to Weil, CMAC obtained a copy of StarBuilder from Geac through "ordinary channels" and began installing it at Taylor's offices in early 1996. Prior to installing the software CMAC provided Taylor with a license agreement for Star-

Builder, as Geac required it to do under Geac's contracts with CMAC. This document purported to be an agreement between Geac, CMAC and the end user, in this case Taylor, for use of the software. The agreement stated that Geac warranted the software "to conform to its published specifications when shipped ... for ninety (90) days from the date of delivery." The agreement further provided that "[Geac] does not warrant that the licensed program will be uninterrupted or error free." The agreement explicitly limited all other warranties by stating that, "[t]he foregoing warranties are in lieu of all other warranties, including but not limited to the implied warranties of merchantability and fitness for a particular purpose." The agreement also included a clause purporting to limit Geac's liability. It provided that Geac's liability in contract or in tort "shall not exceed the actual payments made," and that "[i]n no event will [Geac] be liable for ... lost profits, loss of business, business interruption, or other consequential damages." Finally, the licensing agreement provided that it would not "become a valid and binding obligation of [Geac] unless and until a copy of [it was] received and executed by an officer of [Geac]." Although representatives of both Taylor and CMAC signed the agreement, no officer of Geac ever executed it.

Shortly after CMAC installed StarBuilder at Taylor, Taylor began discovering serious defects in the software that made it entirely unusable. The record reflects that numerous other Geac customers, including other customers of CMAC, were having similar problems with StarBuilder. On March 5, 1996, Geac issued a memorandum to its sales force describing various flaws in the software that customers had discovered. The memorandum further stated that Geac would not ship StarBuilder to any new clients until the known products were rectified, reasoning, "While there are customers and prospects who say they want StarBuilder immediately (never mind the bugs) our experience is that they eventually do care very much.... Better that they find fault with shipping delays than our software." In September 1996, Taylor contacted Geac directly for the first time for help with the product. Geac directed Taylor to continue dealing with CMAC as its provider for software support. Throughout 1996 and 1997 Geac released several new versions of StarBuilder containing corrections to errors that customers had discovered, but was unable to entirely correct the problems that caused StarBuilder to fail. Taylor terminated its relationship with CMAC in 1998, after paying CMAC a total of $240,000 for software, custom development services, project management, training and support, and expending a large number of its own labor resources attempting to implement and use the faulty system.

Taylor initially brought claims of common law fraud and consumer fraud against Geac. Taylor also asserted these same claims against CMAC and Weil. In addition, Taylor brought claims for rescission and restitution, breach of contract, and breach of express and implied warranties against CMAC. Geac moved for summary judgment on Taylor's claims of statutory and common law fraud. In an Order dated May 24, 2000, the Court granted Geac's motion for summary judgment. The Court held that Taylor failed to produce evidence of any misrepresentations made by Geac upon which Taylor should have relied. The Court also determined that Weil's affidavit could be construed to describe only three specific misrepresentations: (1) that StarBuilder was "virtually complete;" (2) that StarBuilder would be available by January 1996; and (3) that StarBuilder would be as reliable, stable, and fully-functional as CS2000. None of those representations, even if attributable to Geac, were found to be statements of

past or present fact sufficient to support a fraud claim. Despite that holding, the Court explicitly gave Taylor leave to amend its Complaint to include claims of breach of contract, breach of warranty and unjust enrichment against Geac. The Court concluded that "dismissing Geac at this juncture will permit it to retain the compensation it received from Taylor for its purchase of an entirely unusable product," and that "[s]uch a result would be ... grossly unfair."

Taylor consequently amended its Complaint to add counts of breach of contract, breach of warranty, and unjust enrichment based primarily on the license agreement signed by Taylor in December 1995. Along with its Answer to Taylor's Amended Complaint, Geac also brought cross-claims against co-defendants Weil and CMAC alleging contractual indemnity based on the parties' VAR agreements and equitable indemnification and contribution based on the conduct of Weil and CMAC. Weil and CMAC responded by asserting its own new cross-claims against Geac for breach of contract, common law fraud, contractual indemnity, and equitable contribution and indemnity.

Geac now moves for summary judgment a second time on all of Taylor's claims, asserting that Taylor's damages are limited to the cost of the StarBuilder software, an amount well below the jurisdictional requirement of 28 U.S.C. § 1332(a). Geac also moves to dismiss the cross-claims of Weil and CMAC pursuant to Fed.R.Civ.P. 12(b)(3), arguing that a forum selection clause in the parties' VAR contract, requiring venue in Texas, should be enforced. Finally, Weil and CMAC move for partial summary judgment on Taylor's common law and statutory fraud claims.

For the reasons set forth below, the Court finds that license agreement between Geac and Taylor is enforceable and that Taylor's claims must be dismissed for lack of subject matter jurisdiction. The Court further finds that Taylor's allegations of common law and statutory fraud fail as a matter of law and summary judgment is granted in favor of Weil and CMAC on those claims. Finally, the Court will not dismiss the cross-claims of defendants Weil and CMAC. Accordingly, Geac's motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(3) is denied.

## ANALYSIS

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn

from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076 (8th Cir.1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir.1981).

## II. Geac's Motion to Dismiss for Lack of Subject Matter Jurisdiction

### A. Breach of Contract and Breach of Warranty

In its Amended Complaint, Taylor asserts claims for breach of contract and breach of warranty against Geac based on a license agreement signed by Taylor in December 1995. Geac argues that the Court must dismiss Taylor's claims for lack of subject matter jurisdiction because the amount in controversy is below the jurisdictional minimum required by 28 U.S.C. § 1332(a). Geac contends that the license agreement limits the damages that Taylor may recover to the price of the StarBuilder software, an amount well below the jurisdictional requirement of $75,000.[2] Taylor contends that the contractual provision limiting damages cannot be enforced against Taylor because a Geac officer did not execute the agreement, an occurrence that Taylor alleges is a condition precedent to enforcement of the agreement. In the alternative, Taylor argues that even if the license agreement is enforceable, Taylor is not limited in its recovery to the price of the software, but instead can elect the remedy of rescission.

Further, Taylor asserts that the total and fundamental breach of the license agreement by Geac invalidates the damage limitation clause. Finally, Taylor argues that the clause limiting its remedies to repair, replacement or recovery of the contract price fails of its essential purpose, prohibiting enforcement of that clause.

The Court must first determine the applicable law on this issue—that is, whether the license agreement is governed by Article II of Minnesota's version of the Uniform Commercial Code ("UCC"), Minn. Stat. §§ 336.2–101 *et seq.,* or whether the agreement falls more properly within the purview of the common law of contracts. For purposes of this motion, the Court assumes that the license agreement for StarBuilder is governed by the UCC. During oral argument, the parties agreed that the UCC is the applicable law.[3]

### 1. Enforceability of License Agreement

■ Taylor first contends that the license agreement cannot be enforced against it because a Geac officer never executed the agreement. The agreement explicitly provides that "[t]his Agreement shall not become a valid and binding obligation of [Geac] unless and until a copy of this Agreement is received and executed by an officer of [Geac]." The agreement continues, stating that "[f]ailure to furnish Customer a copy of this Agreement executed, however, shall in no event abrogate or reduce any obligation of Customer under this Agreement." There appears to be

**2.** The cost of StarBuilder to Taylor was $20,000. Of that amount, $10,000 was paid to Geac and $10,000 was kept by CMAC. For purposes of this motion, the Court will consider the price of the software to be $20,000.

**3.** While this position seems to be in line with the weight of authority, *see, e.g., Micro Data Base Systems, Inc. v. Dharma Systems, Inc.,*

148 F.3d 649, 654 (7th Cir.1998), Minnesota courts do not seem to have explicitly addressed this question. However, in *Valley Paving, Inc. v. Dexter & Chaney, Inc.,* No. C2–00–361, 2000 WL 1182800 (Minn.App. Aug.22, 2000), the Minnesota Court of Appeals analyzed a "sales and license" agreement for computer software, similar to the one here, under the UCC.

no dispute between the parties that a Geac officer never actually executed the license agreement. Both Taylor and Weil, on behalf of CMAC, executed the agreement. Despite Geac's failure to execute the agreement, the license agreement is binding and enforceable.

Taylor asserts that the provision in the agreement requiring execution by Geac is a condition precedent to its enforcement. A condition precedent "is one which is to be performed before the agreement of the parties becomes operative." *Lake County v. Molan*, 269 Minn. 490, 131 N.W.2d 734, 740 (1964). "A condition precedent calls for the performance of some act or the happening of some event after the contract is entered into, and upon the performance or happening of which its obligation is made to depend." *Id.* Loan approval, for example, is a typical condition precedent in a real estate transaction. *Scott v. Forest Lake Chrysler–Plymouth–Dodge*, 611 N.W.2d 346, 350 n. 6 (Minn. 2000). Loan approval is an independent event that occurs after the contract is formed, which triggers the obligations of the parties under the contract. In this case, the requirement of execution by a Geac officer is not comparable to a loan approval—it was not an event upon which the parties' obligations depended. Instead, the issue of execution by a Geac officer goes to the existence of the contract and its enforceability. Indeed, the very language of the license agreement belies the notion that execution by a Geac officer is a condition precedent. The agreement states that the failure of a Geac officer to execute the agreement prohibits its enforcement **against Geac**, but that failure to provide Taylor with an executed copy of the agreement does not abrogate Taylor's obligations under the contract. The clause requiring execution by a Geac officer cannot be considered a condition precedent.

The clause was clearly included in the contract as a protection for Geac, not for Taylor. It is well established that the party seeking to enforce a written agreement need not have signed the agreement if he agreed to the contract and acted in conformity therewith. *Poser v. Abel*, 510 N.W.2d 224, 228 (Minn.Ct.App. 1994). Here, Geac acted in conformity with the agreement by accepting the licensing fee and providing Taylor with StarBuilder. Even if the clause could be considered a condition precedent, Minnesota law provides that one party to a contract may waive a condition precedent which exists for that party's own benefit. *Steinhilber v. Prairie Pine Mut. Ins. Co.*, 533 N.W.2d 92, 93 (Minn.App.1995). This is a situation where Geac's outward actions clearly indicated waiver of the provision. Further, Minn.Stat. § 336.2–201 provides that a contract for the sale of goods is not enforceable unless there is a sufficient writing indicating that the sale has been made and the writing is **signed by the party against whom enforcement is sought**. In this case, Geac is attempting to enforce the agreement against Taylor, the party that signed the document. Accordingly, the license agreement is valid and enforceable.

**2. Enforceability of the Remedy and Damage Limitations in the License Agreement**

The remaining issue then is whether the clauses in the license agreement limiting Taylor's remedies and damages are enforceable. The license agreement provides that "[t]he entire liability of [Geac] and the Customer's exclusive remedy shall be as follows ... (1) the correction by [Geac] of program defects, and (2) if, after reasonable efforts, [Geac] is unable to make the program operate as warranted, the Customer shall be entitled to a refund or the paid license fee." This remedy limitation

is followed by a damages limitation,[4] which provides that "[l]iability of [Geac] for damages to the Customer for any cause whatsoever, and regardless of the form of action, whether in contract or tort ... shall not exceed the actual payments made by customer." The agreement continues on to state that "[i]n no event will [Geac] be liable for any damages caused by the Customer's failure to perform Customer's responsibilities or for any lost profits, loss of business, business interruption, or other consequential damages...."

Taylor argues that the remedy and damages limitations in the license agreement should not be enforced for three reasons. First, Taylor argues that it is not limited to the remedies in the contract, but has a right to elect rescission as its remedy for Geac's breach. Second, Taylor argues that Geac's total and fundamental breach of the agreement invalidates the damages limitation provision. Third, Taylor argues that the limited remedies contained in the license agreement fail of their essential purpose and should not be enforced.

 As noted above, the parties agreed that the license agreement at issue is governed by the UCC. As such, the remedies contained in the UCC are the exclusive remedies available to Taylor in this action for breach of the agreement. *Hapka v. Paquin Farms*, 458 N.W.2d 683, 688 (Minn.1990) ("[i]f the Code is to have any efficacy, parties engaged in commercial activities must be able to depend with certainty on the exclusivity of the remedies provided by the Code"); *Halla v. Norwest Bank*, 601 N.W.2d 449, 451 (Minn.App. 1999) ("when analyzing the interaction be-

tween the common law and other UCC provisions, the Minnesota Supreme Court has emphasized the value of maintaining an exclusive set of remedies for commercial transactions"). Rescission is not technically available under the UCC, but is an equitable remedy, available under the common law where a material breach is irreparable, when damages at law are inadequate, or when damages would be difficult or impossible to determine. *In re Digital Resource LLC*, 246 B.R. 357, 369 (8th Cir. BAP 2000) (citing *Marso v. Mankato Clinic, Ltd.*, 278 Minn. 104, 153 N.W.2d 281, 290 (1967); *Johnny's, Inc. v. Njaka*, 450 N.W.2d 166, 168 (Minn.Ct.App.1990)). In this case, while Taylor believes that its remedy under the UCC is not adequate under the circumstances, the Court cannot say that Taylor's remedy at law is inadequate.[5] The common law remedy of rescission is therefore inapplicable in this case.

 While the remedy of rescission is not available under the UCC, the UCC does provide for revocation of acceptance under the following circumstances: when the non-conformity of the goods substantially impairs their value; when the buyer accepted the goods on the reasonable assumption that the non-conformity would be cured and it has not seasonably been cured; and when the buyer gives the seller notification of revocation within a reasonable time after the buyer discovers or should have discovered the non-conformity. Minn.Stat. § 336.2–608. In fact, the Comment to this section of the UCC provides that:

> consequential damages. The additional issue of whether those remedies are limited because of a clause in the parties' agreement does not affect the determination that the remedies potentially available to Taylor under the UCC are adequate.

---

4. This clause is also referred to as an exclusion of consequential damages. These phrases will be used interchangeably throughout the order.

5. The UCC provides Taylor with a number of potential remedies, including the recovery of

[t]he section no longer speaks of 'rescission,' a term capable of ambiguous application either to transfer of title to the goods or to the contract of sale and susceptible also of confusion with cancellation for cause of an executed or executory portion of the contract. The remedy under this section is instead referred to simply as 'revocation of acceptance' of goods tendered under contract for sale and involves no suggestion of 'election' of any sort.

This Comment indicates the drafters' intention to replace, or at least recast the remedy of rescission with the remedy of revocation of acceptance under the UCC. *See, e.g., Sudol v. Rudy Papa Motors,* 175 N.J.Super. 238, 417 A.2d 1133, 1135 (1980) ("[u]nder the Code, the equitable remedy of rescission no longer exists as such"); *Henderson v. Chrysler Corp.,* 191 Mich. App. 337, 477 N.W.2d 505, 507 (1991) ("[defendant] correctly asserts that rescission is an equitable remedy and that the UCC no longer provides for rescission, but rather substitutes revocation of acceptance"). The Court will therefore consider Taylor's request for rescission as one for revocation pursuant to Minn.Stat. § 336.2–608. *Henderson,* 477 N.W.2d at 507 (treating action for rescission as one for revocation of acceptance); *Claxton v. Boothe,* 101 Or. App. 416, 790 P.2d 1201, 1202 (1990) (same).

Revocation permits the buyer to return the goods for the purchase price and also to sue for damages based on the breach as permitted by the UCC. Minn.Stat. § 336.2–608(3) ("[a] buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them"); *Id.* Minnesota Code Comment to sub. 2–608(3) ("[i]t changes the rule that a rescinding buyer could not also recover damages but that a rejecting buyer could"). However, the additional remedies permitted by the UCC following revocation of acceptance do nothing to advance Taylor's position in this case. Returning Star-Builder for the purchase price does not get Taylor to the jurisdictional requirement of $75,000. Further, the additional remedies available to Taylor after revocation, as provided by the UCC, are also subject to the limitation of remedies and damages clauses in the license agreement. Therefore, the Court must determine whether those clauses are enforceable.

 Taylor argues that remedy limitation contained in the license agreement fails of its essential purpose and should not be enforced. Taylor seems to contend that if the remedy limitation fails of its essential purpose, then the damages limitation must also fail with it. However, under Minnesota law these two provisions must be evaluated separately and under different standards. This was made abundantly clear by the Minnesota Supreme Court in *International Fin. Servs. v. Franz,* 534 N.W.2d 261 (Minn.1995). There, the court stated:

> [w]e too are of the opinion that the better reasoned approach is to treat the repair or replacement remedy and a consequential damage exclusion as discrete and independent contractual provisions. Accordingly, the consequential damage exclusion is valid unless unconscionable.

*Id.* at 269. The Court noted that this distinction is appropriate in a commercial setting where two merchants of relatively equal bargaining power contract. *Id.* That is clearly the case here. Both Taylor and Geac are sophisticated merchants of relatively equal bargaining power engaged in an arms-length transaction for commercial purposes. As a result, the limitation of remedy and limitation of damages clauses must be analyzed independently and under different standards. The remedy limitation is valid unless it fails of its essential

purpose, while the damages limitation is valid unless unconscionable. *Id.* at 267–69.

In this case, the limited remedy contained in the license agreement does not fail of its essential purpose. An exclusive remedy fails of its essential purpose "if circumstances arise to deprive the limiting clause of its meaning or one party of the substantial value of its bargain." *Valley Paving, Inc.,* 2000 WL 1182800, at *4. In a case factually similar to the case at bar, the Minnesota Court of Appeals found that a contract provision that limited the customer's remedy to return of the purchase price, repair of the software, or replacement did not fail of its essential purpose. *Id.* Here, Taylor's remedy was not limited only to repair or replacement of the software. The remedy limitation also permitted Taylor to return the software for a refund of the purchase price in the event that repair or replacement was inadequate. Although this remedy does not cover all of the costs incurred by Taylor in attempting to fix StarBuilder, the Court cannot find that the remedy limitation failed of its essential purpose.

Just as the limited remedy provision is enforceable, so too is the provision excluding consequential damages. A clause limiting damages or excluding consequential damages will generally be enforced unless it is unconscionable. Minn.Stat. § 336.2–719(3); *International Fin. Servs.,* 534 N.W.2d at 269. "An exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk that is conscionable as a matter of law." *Transport Corp. of Amer. v. International*

*Bus. Mach. Inc.,* 30 F.3d 953, 960 (8th Cir.1994) (applying Minnesota law). For purposes of determining unconscionability, the Court is to evaluate the clause at the time of its making. Minn.Stat. § 336.2–302 cmt. 1. At the time the parties entered into the license agreement, the Court cannot find that the parties were so unequal in bargaining power or that the agreement was so one-sided as to render the clause unconscionable. The parties are both relatively sophisticated businesses and the claim here is for commercial loss. *International Fin. Servs.,* 534 N.W.2d at 269. As such, the provision of the contract excluding consequential damages is enforceable.

Finding that the limitation of remedies and limitation of damages clauses contained in the license agreement are enforceable, the Court is constrained to hold that it lacks subject matter jurisdiction to hear Taylor's breach of contract and breach of warranty claims.[6] "When a motion to dismiss for lack of subject matter jurisdiction brings into issue the value of the amount in controversy, the plaintiff bears the burden of establishing the jurisdictional requirement with 'competent and preponderant proof.'" *DuBose v. International House of Pancakes,* No. 92–2351, 1993 WL 83423, at *1 (8th Cir. Mar. 23, 1993) (quoting *Hedberg v. State Farm Mut. Auto. Ins. Co.,* 350 F.2d 924, 929 (8th Cir.1965)). Taylor has not carried its burden on this issue. As the maximum potential damages recoverable by Taylor is limited to the $20,000 purchase price of StarBuilder, Taylor cannot, as a matter of law, reach the jurisdictional requirement. 28 U.S.C. § 1332(a); *DuBose,* 1993 WL

**6.** Taylor's additional argument that a total and fundamental breach of the agreement invalidates the limitation of damages provision is simply not the law in Minnesota. Taylor's reliance on *Dunkley Surfacing Co. v. George Madsen Constr., Co.,* 285 Minn. 415, 173

N.W.2d 420 (1970), is misplaced because that case deals with a situation in which common law rather than the UCC applied. As noted above, the UCC governs this agreement and provides the exclusive remedies available to Taylor. *Hapka,* 458 N.W.2d at 688.

83423, at *2–*3 (dismissing claim for lack of subject matter jurisdiction for failure to reach jurisdictional requirement). The Court therefore grants Geac's motion to dismiss Taylor's counts of breach of contract and breach of warranty for lack of subject matter jurisdiction.

### B. Unjust Enrichment

██ Geac also moves for summary judgment on Taylor's claim of unjust enrichment. Geac argues that Taylor's claim for unjust enrichment is barred because of the existence of the license agreement between the parties. Geac argues in the alternative that even if the unjust enrichment claim is not barred, the maximum amount recoverable for the claim is the amount Taylor paid Geac for the Star-Builder software.

██ The existence of an express contract between parties precludes recovery under theories of quasi-contract, unjust enrichment, or quantum meruit. *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 126 (Minn.Ct.App.1998) (citing *Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn.1984)). Here, as discussed above, the license agreement governs the parties' relationship with respect to the StarBuilder software. Consequently, Taylor is precluded from recovery under the theory of unjust enrichment. Summary judgment is therefore granted in favor of Geac on Taylor's claim for unjust enrichment.

### III. Geac's Motion to the Dismiss Cross–Claims of Dennis Weil and CMAC Pursuant to Fed.R.Civ.P. 12(b)(3)

██ Geac moves to dismiss the cross-claims of Dennis Weil and CMAC for im-

proper venue pursuant to Fed.R.Civ.P. 12(b)(3). Geac argues that the basis of the cross-claims by Weil and CMAC is a 1996 VAR agreement between the parties that includes a forum selection clause providing that "[t]he parties submit to the exclusive jurisdiction of the Courts of the State of Texas." Geac argues that this forum selection clause should be enforced and that the Court should dismiss the action for improper venue.[7] Weil and CMAC argue that Geac waived the forum-selection clause by initiating cross-claims against them based in part on an earlier version of the VAR. Weil and CMAC also argue that the forum selection clause is unreasonable and unjust under the circumstances and should not be enforced.

The original Complaint in this matter was filed by Taylor in December 1998. In February 1999, Geac, Weil and CMAC filed Answers to the Complaint. At that time, none of them asserted cross-claims against each other. In response to the Court's May 24, 2000 Order, Taylor amended its Complaint on June 20, 2000, to include additional claims against Geac. Geac countered with an Amended Answer that included cross-claims against Weil and CMAC for contribution and indemnity. On August 14, 2000, CMAC and Weil filed a joint Answer to Geac's cross-claims and also asserted their own cross-claims against Geac alleging contractual indemnity, common law fraud, as well as equitable contribution and indemnity.

██ The Court, sitting in diversity, will apply federal law to determine the applicability of a forum selection clause. *Knutson v.. Rexair*, 749 F.Supp. 214, 216 (D.Minn.1990). Forum selection clauses are prima facie valid and should be en-

---

7. Geac also argues that the cross-claims of Weil and CMAC are untimely and should be dismissed for that reason as well. Because of the unique procedural posture of this case,

the unusual sequence of pleading, and the potential prejudice to Weil and CMAC, the Court will not dismiss the cross-claims as untimely.

forced unless enforcement is shown by the resisting party to be unreasonable or unjust or the clause is shown to be invalid for such reason as fraud or overreaching. *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). While the Court normally gives deference to the legitimate expectations of parties that have agreed to contract in the area of forum selection, this case creates a situation in which the enforcement of the forum selection clause is unreasonable and has the potential to be unjust.

Currently, all claims relating to the StarBuilder license agreement are joined before this Court. Ultimate resolution of this case will dispose of all claims among the parties with respect to StarBuilder. Geac essentially requests that the Court dismiss a portion of the lawsuit and force Weil and CMAC to re-file those claims in Texas. Under these circumstances, that decision could result in either preclusion of Weil's and CMAC's claims in the Texas courts or in the potential for conflicting judgments. In addition, a decision requiring Weil and CMAC to re-file certain claims in Texas would be an inefficient use of judicial resources as well as an unnecessary waste of the litigants' resources. *Ace Novelty Co. v. Vijuk Equipment, Inc.*, No. 90–C–3116, 1991 WL 150191, at *7 (N.D.Ill. July 31, 1991) (refusing to enforce a forum selection clause because of the potential for preclusion of one party's claims or conflicting judgments). Retaining jurisdiction over the cross-claims of Weil and CMAC will allow this Court to fully and finally resolve all claims stemming from the StarBuilder license agreement. Enforcement of the forum selection clause in this case would be both unreasonable and potentially unjust. As a result, the Court will allow the cross-claims of Weil and CMAC to proceed. Geac's motion to dismiss for improper venue is therefore denied.

## IV. Partial Motion for Summary Judgment of Dennis Weil and CMAC

Dennis Weil and CMAC move for partial summary judgment on Taylor's common law and consumer fraud claims. Weil and CMAC argue that Taylor has submitted no evidence of affirmative misrepresentations by Weil or CMAC that support its fraud claims. They also argue that the alleged omissions by Weil and CMAC cannot support Taylor's fraud claims. Because the Court does not find any actionable misrepresentations or omissions that Weil and CMAC knew or should have know to be false, summary judgment is granted in favor of Weil and CMAC.

■■■ Taylor brings two fraud counts against Weil and CMAC, one for common law fraud and one for consumer fraud pursuant to the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), Minn. Stat. §§ 325F.68, 325F.69. In order to state a claim for common law fraud, Taylor must demonstrate that Weil and CMAC:

(1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation.

*M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn.1992); *Gorham v. Benson Optical*, 539 N.W.2d 798, 802 (Minn.Ct.App.1995).

■■■ The parameters of Taylor's statutory consumer fraud claim are somewhat broader than those applicable to common law fraud. *LeSage v. Norwest Bank Calhoun–Isles*, 409 N.W.2d 536, 539 (Minn. Ct.App.1987). In order to state such a

claim, Taylor must demonstrate that Weil and CMAC engaged in "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice" with the intent that others rely on their allegedly improper statements or conduct. Minn.Stat. § 325F.69, subd. 1. In contrast with common law fraud, however, · a plaintiff seeking only injunctive relief under the MPCFA need not prove actual damages. *LeSage,* 409 N.W.2d at 539. Nevertheless when, as in this case, the plaintiff seeks monetary damages under the statute, it must demonstrate a causal nexus between the improper conduct and the monetary losses alleged. *Id.*

The level of scienter necessary to prove fraud under the MPCFA may also be less than that required on a claim of common law fraud. A few Minnesota courts have held that intent to mislead is not a prerequisite to recovery under the MPCFA, finding that a showing of negligent misrepresentation is sufficient. *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 849–50 (D.Minn.1989); *Church of the Nativity of Our Lord v. WatPro, Inc.,* 474 N.W.2d 605 (Minn.Ct.App.1991), *aff'd on other grounds,* 491 N.W.2d 1, 8 (Minn.1992) (explicitly declining to address whether negligent misrepresentation is sufficient to trigger liability under the MPCFA). These courts hold that a claimant is required to prove only that the alleged wrongdoer "knew or should have known" that its representations were false or misleading when made. *Cf. Church of the Nativity,* 491 N.W.2d at 9–10 (Simonett, J., concurring in part and dissenting in

part) (noting that the "should have known" standard applied by the lower court is equivalent to negligent rather than intentional misrepresentation). The Minnesota Supreme Court apparently neither has adopted nor rejected this diminished intent requirement, and therefore, whether it applies to the MPCFA has not been determined with finality. *Id.* at 8.

Taylor bases both its common law and consumer fraud claims on various misrepresentations that Weil allegedly made concerning the capability and readiness of StarBuilder. Taylor also bases its fraud claims on Weil's alleged concealment of critical information from Taylor. Weil and CMAC seek summary judgment on both claims arguing that Taylor has failed to produce, since the Court's May 24, 2000 order, any new evidence of representations by Weil or CMAC that support its fraud claims. Weil and CMAC also argue that the initial representations relied by Taylor are nothing more than "mere predictions" that cannot serve as the basis for fraud.

■ The Court agrees with Weil and CMAC. Taylor has the burden of producing evidence of misrepresentation, and in the absence of such evidence Taylor's fraud claims must fail. *Minnesota Forest Products, Inc. v. Ligna Machinery, Inc.,* 17 F.Supp.2d 892, 911 (D.Minn.1998). Taylor has failed to point to any evidence of direct misrepresentations or material omissions by Weil that are actionable. Taylor relies on a litany of "facts" that were allegedly confirmed in the recent depositions of Weil, Leslie Latson, and James Roland.[8] However, of the facts list-

---

8. Taylor lists the following "facts" confirmed by depositions: (1) that StarBuilder was not released in the market until sometime after the end of 1996; (2) that Taylor was the first customer to receive and begin installation of StarBuilder; (3) that Taylor was used as a beta test site without its knowledge; (4) that Taylor's name was included on Geac's internal "beta testers" list; (5) that no one at Geac

ever told Taylor that it was "beta testing" StarBuilder; (6) that according to Geac, Weil/CMAC were responsible for communicating the fact that StarBuilder was in its testing phase to Taylor; (7) that Taylor does not recall seeing "beta markings" on the StarBuilder disks; (8) that Geac hired a company in India to write the StarBuilder program and

ed by Taylor, none constitute evidence of direct misrepresentations **by Weil**. Rather, 11 of the 15 "facts" asserted by Taylor are representations or omissions by Geac, not by Weil or CMAC. The only "new facts" asserted by Taylor that relate to Weil and CMAC refer to allegations of omission or concealment of critical information, but not affirmative misrepresentations.

■ Therefore, the only alleged direct misrepresentations made by Weil and CMAC are those indicated in Taylor's responses to the interrogatories of CMAC and Weil. In its interrogatory responses, Taylor alleges the following representations that it argues serve as the basis for its fraud claims: (1) that StarBuilder contained a functional payroll module that could reliably perform standard payroll accounting and record-keeping functions; (2) that StarBuilder could prepare and print consolidated financial statements for field sales offices; (3) that StarBuilder could be used to enter new vendors or invoices into the accounts payable function; and (4) that StarBuilder could be part of an integrated software system. While these statements are arguably statements about the capabilities of a product that can support a fraud claim, *see Minnesota Forest Products, Inc.*, 17 F.Supp.2d at 909, there is absolutely no evidence to suggest that in 1995, at the time Weil made these statements and before he installed the software, that Weil knew or should have known them to be false. Each of these statements were based totally on information provided to

Weil from Geac. Taylor has failed to create a genuine issue of material fact concerning whether Weil and CMAC knew that the alleged misrepresentations were false or should have known them to be false. *Minnesota Forest Products, Inc.*, 17 F.Supp.2d at 911. As a result, these representations cannot support Taylor's fraud claims.

■ In its interrogatory responses, Taylor also relies on the affidavits of Dennis Weil and Maureen Herzog to support its fraud allegations. However, as discussed in the Court's May 24, 2000 Order, these affidavits may be construed to describe only three specific misrepresentations: 1) that StarBuilder was "virtually complete;" 2) that StarBuilder would be available by January 1996; and 3) that StarBuilder would·be as reliable, stable, and fully-functional as CS2000. All three of these statements constitute representations of expectations as to the outcome of future events, rather than statements of past or present fact. *See, e.g., Midwest Printing, Inc. v. AM International, Inc.*, 108 F.3d 168, 170–71 (8th Cir.1997). Such statements of future expectations cannot, as a matter of law, support Taylor's fraud claims.

■ In order to state a claim of intentional misrepresentation under either the common law or the MPCFA, Taylor must demonstrate that Weil and CMAC made the statements at issue with the actual knowledge that they were false when

was dissatisfied with the company's overall performance; (9) that Geac's National Customer Support Manager and Product Development Manager believed StarBuilder was released prematurely; (10) that no published specifications ever existed for StarBuilder; (11) that the Geac Product Development Manager with direct responsibility for StarBuilder was demoted and his supervisor was asked to leave the company; (12) that several of Weil/CMAC's other customers replaced StarBuild-

er with CS2000, but Weil did not tell Taylor this fact; (13) that Taylor was not told of Geac's sales policy to first install CS2000 and then offer StarBuilder as a free upgrade; (14) that Weil had serious concerns about lawsuits stemming from StarBuilder in May 1996 and decided to renegotiate his reseller agreement with Geac, but failed to inform Taylor of this; and (15) that Weil began to complain about StarBuilder in the summer of 1996, but did not tell Taylor.

made. It is not enough for Taylor to show in hindsight that predictions regarding StarBuilder's completion and availability later turned out to be incorrect. *Caritas Family Servs.*, 488 N.W.2d at 289 (stating that a representation of past or present fact is required to establish common law fraud); *Gorham*, 539 N.W.2d at 802 (holding, "Hindsight now proves that the statement became false, but [the plaintiff's] fraud claim requires that [the defendant], at the time of the statement, misrepresented 'a past or present fact,' not a future, unpredictable event."); *cf. Church of the Nativity*, 491 N.W.2d at 9 (Simonett, J., concurring in part and dissenting in part) (distinguishing intentional fraud under the MPCFA, which includes "a promise to do some act in the future, which promise the promisor did not intend to perform at the time the promise was made," from negligent misrepresentation). Thus, Taylor must demonstrate that Weil and CMAC did not really believe in November 1995 that StarBuilder would be completed by January 1996, or that it would be as reliable and stable a product, when finished, as CS2000. Taylor has presented no evidence, direct or indirect, from which a reasonable jury could draw such a conclusion.

Taylor also raises for the first time in its response to Weil's and CMAC's partial motion for summary judgment, that a number of omissions or concealments by Weil and CMAC can also serve as bases for its fraud claims. However, the "newly confirmed evidence" listed in Taylor's brief can only be construed to demonstrate the following omissions or concealments by Weil and CMAC: (1) that Weil was responsible for communicating the fact that StarBuilder was still in its testing phase to Taylor; (2) that Weil failed to tell Taylor that some of his other customers were experiencing similar problems with Star-Builder; (3) that Weil failed to tell Taylor about Geac's sales policy, which encour-

aged resellers to first install CS2000 and then offer free upgrades of StarBuilder once the product was stabilized; (4) that Weil failed to tell Taylor that by May 1996 he had serious concerns about potential lawsuits regarding StarBuilder and that he had renegotiated CMAC's reseller agreement with Geac; (5) that Weil did not share his concerns about the performance of StarBuilder with Taylor in the summer of 1996; and (6) that Weil did not inform Taylor that it was acting as a "beta test" site for StarBuilder.

 A misrepresentation that can serve as a basis for a fraud claim may be made by concealing or failing to disclose certain facts that render facts previously disclosed misleading. *Caritas Family Servs.*, 488 N.W.2d at 289. As a general rule, one party to a transaction has no duty to disclose material facts to the other. *L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn.1989). However, there are three exceptions to this general rule: (1) when a confidential or fiduciary relationship exists; (2) when disclosure is necessary to clarify misleading information already disclosed; or (3) when one party has "special knowledge" of material facts to which the other party does not have access. *American Computer Trust Leasing v. Boerboom Int'l., Inc.*, 967 F.2d 1208, 1211–12 (8th Cir.1992).

 Here, there is no allegation of a fiduciary relationship between Taylor and CMAC or Weil. *Id.* at 1212 (arms length business transaction does not give rise to fiduciary duty to disclose). Taylor seems to rely on the second two exceptions to support its argument that Weil's omissions can serve as the basis for its fraud claims. However, none of the alleged omissions required disclosure to clarify misleading information. The only conceivable omission falling within this category is Taylor's contention that Weil and CMAC failed to

disclose that StarBuilder was still in its testing phase. This fact, however, was known by Taylor at the early stages of negotiation and therefore is not evidence of a misrepresentation.

There are very few cases outlining the types of situations in which the third exception to the general rule that there is no duty to disclose should be applied. *L & H Airco, Inc.*, 446 N.W.2d at 380 ("we have rarely addressed that particular theory of fraud"). In one instance, the Minnesota Supreme Court held that it was fraud for a bank not to disclose to a borrower that a bank depositor with whom the borrower was dealing was insolvent and was engaging in fraudulent business practices. *Richfield Bank & Trust v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648, 650 (1976). In that case, the bank had actual knowledge of the deposited fraudulent practices. *Id.* It was that "special information" that gave rise to the affirmative duty to disclose. Considering previous cases applying this third exception, the Court finds that the remaining omissions alleged by Taylor are not sufficient to support its fraud claims. The facts here indicate an arms length business transaction between Weil/CMAC and Taylor. This situation does not rise to one in which Weil and CMAC can be considered to have "special knowledge" of material facts that requires disclosure. It is inappropriate for the Court to burden Weil with the duty to disclose personal concerns and legitimate business information. The fact that some of his other customers were experiencing difficulties with StarBuilder and that he personally had concerns about potential lawsuits that prompted him to renegotiate CMAC's reseller agreement are not the types of special knowledge contemplated by the exception. The same can be said for the alleged omissions concerning Geac's sales policy. To require Weil to disclose this type of knowledge, based only on an arms-length commercial business transaction, places too heavy an onus on Weil. The Court does not believe that the Minnesota courts intended such an extension of the general nondisclosure rule. For these reasons, the Court finds that Taylor has failed to present sufficient evidence of misrepresentations or omissions to support its fraud claims. As a result, the Court grants Weil's and CMAC's motion for partial summary judgment.

## ORDER

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Geac's motion to dismiss for lack of subject matter jurisdiction [Docket No. 114] is **GRANTED** and Taylor's claims of breach of contract (Count VIII), breach of express and implied warranties (Count IX), and unjust enrichment (Count X) are **Dismissed with prejudice.**

2. Geac's motion to dismiss the cross-claims of Dennis Weil and CMAC [Docket No. 124] is **DENIED.**

3. The motion of Dennis Weil and CMAC for partial summary judgment [Docket No. 136] is **GRANTED** and Taylor's claims of common law and statutory fraud (Counts III and IV) are **Dismissed with prejudice.**